RECORD NO.

# 14-1381

𝕴𝖓 𝕿𝖍𝖊
# 𝖀𝖓𝖎𝖙𝖊𝖉 𝕾𝖙𝖆𝖙𝖊𝖘 𝕮𝖔𝖚𝖗𝖙 𝖔𝖋 𝕬𝖕𝖕𝖊𝖆𝖑𝖘
### 𝕱𝖔𝖗 𝕿𝖍𝖊 𝕾𝖊𝖈𝖔𝖓𝖉 𝕮𝖎𝖗𝖈𝖚𝖎𝖙

## SENSATIONAL SMILES, LLC, DBA Smile Bright,

*Plaintiff – Appellant,*

## LISA MARTINEZ,

*Plaintiff,*

**v.**

## JEWEL MULLEN, DR., in her official capacity as Commissioner of Public Health, JEANNE P. STRATHEARN, DDS, in her official capacity as a Member of the Connecticut Dental Commission, ELLIOT S. BERMAN, DDS, in his official capacity as a Member of the Connecticut Dental Commission, LANCE E. BANWELL, DDS, in his official capacity as a Member of the Connecticut Dental Commission, PETER S. KATZ, DMD, in his official capacity as a Member of the Connecticut Dental Commission, STEVEN G. REISS, DDS, in his official capacity as a Member of the Connecticut Dental Commission, MARTIN UNGAR, DMD, in his official capacity as a Member of the Connecticut Dental Commission, BARBARA B. ULRICH, in her official capacity as a Member of the Connecticut Dental Commission,

*Defendants – Appellees.*

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT AT NEW HAVEN**

_____

## BRIEF OF APPELLANT
## WITH SPECIAL APPENDIX

_____

**Paul M. Sherman**
**Dana Berliner**
**INSTITUTE FOR JUSTICE**
**901 North Glebe Road, Suite 900**
**Arlington, Virginia 22203**
**(703) 682-9320**

*Counsel for Appellant*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to FRAP 26.1, Plaintiff-Appellant, Sensational Smiles, LLC, d/b/a

Smile Bright, certifies that it does not have a parent corporation and no publicly

held corporation owns 10% or more if its stock.

/s/ Paul M. Sherman
Paul M. Sherman

i

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ........................................................i

TABLE OF CONTENTS........................................................................ ii

TABLE OF AUTHORITIES ................................................................iv

JURISDICTIONAL STATEMENT .......................................................1

ISSUES PRESENTED FOR REVIEW ..................................................1

STATEMENT OF THE CASE...............................................................2

    I.    Plaintiff-Appellant's Services and the Dental Commission's Declaratory Ruling ..................................................................3

    II.    Evidence Before the District Court ......................................6

        A.    Evidence regarding the safety of LED lights.............................6

        B.    Evidence regarding the irrelevance of dental education for teeth whitening .....................................................9

        C.    Evidence regarding the incentives of dentists to restrict competition...............................................................10

    III.    The District Court's Opinion.............................................12

SUMMARY OF THE ARGUMENT .....................................................12

ARGUMENT .......................................................................................14

    I.    The Rational-Basis Test, While Deferential, Is Not a Rubber Stamp.......................................................................15

A.  Regulations fail the rational-basis test when there is no logical connection between the regulation and a legitimate government interest ....................................................16

B.  Regulations fail the rational-basis test when there is an extreme, irrational mismatch between costs and benefits ........18

II.  It Is Not Rational to Require a Person to Have Eight Years of Higher Education Before They May Point the Equivalent of a Flashlight at Another Person's Mouth ................................................20

A.  It is not plausible that the identity of the individual positioning a teeth-whitening light has any relationship to the safety of that light ..............................................................20

B.  Even if such a relationship were plausible, the costs of Connecticut's policy are so disproportionate to its illusory benefits as to be irrational............................................26

CONCLUSION ........................................................................................28

CERTIFICATE OF FILING AND SERVICE

CERTIFICATE OF COMPLIANCE

SPECIAL APPENDIX

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Allegheny Pittsburgh Coal Co. v. Cnty. Comm'n*,
   488 U.S. 336 (1989)..................................................................15, 17, 19

*Baccus v. Karger*,
   692 F. Supp. 290 (S.D.N.Y. 1988) ..........................................15, 21

*Barletta v. Rilling*,
   973 F. Supp. 2d 132 (D. Conn. 2013) ...........................................15

*Beatie v. City of New York*,
   123 F.3d 707 (2d Cir. 1997) ..............................................16, 24, 25

*Chappelle v. Greater Baton Rouge Airport Dist.*,
   431 U.S. 159 (1977)........................................................................15

*City of Cleburne v. Cleburne Living Ctr.*,
   473 U.S. 432 (1985)..................................................................15, 17

*Clayton v. Steinagel*,
   885 F. Supp. 2d 1212 (D. Utah 2012) .....................................22, 23

*Cornwell v. Hamilton*,
   80 F. Supp. 2d 1101 (S.D. Cal. 1999) .....................................22, 23

*Craigmiles v. Giles*,
   312 F.3d 220 (6th Cir. 2002) ...................................................18, 29

*Hague v. Comm. for Indus. Org.*,
   307 U.S. 496 (1939)..........................................................................5

*Hooper v. Bernalillo Cnty. Assessor*,
    472 U.S. 612 (1985) ......................................................................15

*In re N.C. Bd. of Dental Exam'rs*,
No. 9343 (F.T.C. Dec. 7, 2011), *aff'd sub nom.*,
*N.C. State Bd. of Dental Exam'rs v. FTC*,
717 F.3d 359 (4th Cir. 2013), *cert. granted*,
134 S. Ct. 1491 (2014)................................................................11

*James v. Strange*,
407 U.S. 128 (1972)........................................................15, 19

*Jones v. Schneiderman*,
888 F. Supp. 2d 421 (S.D.N.Y. 2012) ............................................25

*Lawrence v. Texas*,
539 U.S. 558 (2003)................................................................15

*Lindsey v. Normet*,
405 U.S. 56 (1972)........................................................15, 19, 28

*Martinez v. Mullen*,
No. 3:11-cv-01787, 2014 WL 1315658,
2014 U.S. Dist. LEXIS 41837 (D. Conn. Mar. 28, 2014) ............................12

*Mayer v. City of Chicago*,
404 U.S. 189 (1971)........................................................15, 17

*Metro. Life Ins. Co. v. Ward*,
470 U.S. 869 (1985)................................................................15

*Orient Ins. Co. v. Daggs*,
172 U.S. 557 (1899)................................................................5

*Plyler v. Doe*,
457 U.S. 202 (1982)....................................................15, 18, 19, 27

*Quinn v. Millsap*,
491 U.S. 95 (1989)........................................................15, 17

*Reed v. Reed*,
404 U.S. 71 (1971)........................................................15, 19

*Romer v. Evans*,
    517 U.S. 620 (1996)................................................................15

*Schware v. Bd. of Bar Exam'rs*,
    353 U.S. 232 (1957)................................................................23

*Schweiker v. Wilson*,
    450 U.S. 221 (1981)................................................................14

*St. Joseph Abbey v. Castille*,
    712 F.3d 215 (5th Cir. 2013) ..........................................16, 18

*Turner v. Fouche*,
    396 U.S. 346 (1970)..........................................................15, 17

*U.S. Dep't of Agric. v. Moreno*,
    413 U.S. 528 (1973)..........................................................15, 17

*United States v. Lopez*,
    514 U.S. 549 (1995)................................................................15

*United States v. Morrision*,
    529 U.S. 598 (2000)................................................................15

*United States v. Windsor*,
    133 S. Ct. 2675 (2013)............................................................15

*Vill. of Willowbrook v. Olech*,
    528 U.S. 562 (2000)................................................................15

*Williams v. Vermont*,
    472 U.S. 14 (1985)............................................................15, 17

*Windsor v. United States*,
    699 F.3d 169 (2d Cir. 2012), *aff'd*,
    133 S. Ct. 2675 (2013)............................................................14

*Zobel v. Williams*,
    457 U.S. 55 (1982)......................................................15, 16, 17

## CONSTITUTIONAL PROVISION

U.S. CONST. amend. XIV .......................................................................1, 4, 5, 12, 13

## STATUTES

28 U.S.C. § 1291 ...........................................................................................................1

28 U.S.C. § 1331 ...........................................................................................................1

28 U.S.C. § 1343 ...........................................................................................................1

28 U.S.C. §§ 2201–2202 ..............................................................................................1

42 U.S.C. § 1983 ...........................................................................................................1

Conn. Gen. Stat. § 19a-17(a)(6) ...................................................................................5

Conn. Gen. Stat. § 20-114(a) ........................................................................................5

Conn. Gen. Stat. § 20-126 .............................................................................................5

Conn. Gen. Stat. § 53a-35a(8) .......................................................................................5

## OTHER AUTHORITIES

Fed. Trade Comm'n, *FTC Concludes North Carolina Dental Board Illegally Stifled Competition by Stopping Non-Dentists From Providing Teeth Whitening Services* (Dec. 7, 2011), http://ftc.gov/opa/2011/12/ncdental.shtm (last visited Sept. 11, 2014)............................................................................... 11-12

Video Demonstration of Smile Bright's Services, *available at* http://www.youtube.com/watch?v=IjZ_8qbzsGI ......................................................3

## JURISDICTIONAL STATEMENT

This lawsuit challenges the constitutionality of a declaratory ruling issued by the Connecticut State Dental Commission. Plaintiff-Appellant Sensational Smiles, LLC, d/b/a Smile Bright has brought claims under the Civil Rights Act of 1871, 42 U.S.C. § 1983, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, alleging that the Dental Commission's declaratory ruling, as applied to Plaintiff-Appellant, violates the Due Process and Equal Protection Clauses of the Fourteenth Amendment. The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1343.

Following cross-motions for summary judgment, the district court issued a final judgment disposing of all claims on March 31, 2014. Smile Bright filed a timely notice of appeal on April 22, 2014. Because this appeal arises from a final decision of a district court of the United States, this Court has jurisdiction under 28 U.S.C. § 1291.

## ISSUES PRESENTED FOR REVIEW

The State of Connecticut prohibits non-dentists who offer teeth-whitening services from positioning low-powered LED lights in front of their customers' mouths, but does not prohibit non-dentists from making these lights available for customers to use where teeth-whitening products are purchased or allowing untrained customers to position the lights in front of their own mouths.

1

The issue on appeal is:

1)    Whether the district court erred in concluding that there is a rational
      basis for Connecticut's prohibition on non-dentists positioning LED
      lights in front of their customers' mouths.

## STATEMENT OF THE CASE

This case is a constitutional challenge to a state declaratory ruling that

irrationally and arbitrarily interferes with the right to earn an honest living.

Plaintiff-Appellant Smile Bright wishes to offer self-administered teeth-whitening

services in Connecticut. As part of those services, Smile Bright wants to make

available to its customers low-powered LED lights that enhance the teeth-

whitening process. And, as is consistent with the way such services are offered in

other states in the Second Circuit and across the country, Smile Bright wishes to

assist their customers by positioning the lights in front of the customers' mouths,

rather than requiring their customers to do so themselves. Smile Bright cannot

position teeth-whitening lights for their customers, however, because the

Commission has ruled that any Smile Bright employee who assists a customer in

positioning a teeth-whitening light in front of the customer's mouth is guilty of the

unlicensed practice of dentistry, a felony offense punishable by up to five years in

jail and $25,000 in civil fines per customer.

In Section I, below, Plaintiff-Appellant provides additional detail about its

services and the effect that the Dental Commission's declaratory ruling had on its

2

business. In Section II, Plaintiff-Appellant summarizes the relevant factual evidence before the district court. Finally, in Section III, Plaintiff-Appellant summarizes the district court's ruling on the parties' cross-motions for summary judgment.

## I.     Plaintiff-Appellant's Services and the Dental Commission's Declaratory Ruling.

Plaintiff-Appellant Sensational Smiles LLC d/b/a Smile Bright (hereinafter "Smile Bright") is a Connecticut company that, until 2011, offered non-dentist teeth-whitening services in the state of Connecticut. A video containing an accurate demonstration of Smile Bright's services, including the use of the LED light that is at the center of this appeal, is available at http://www.youtube.com/watch?v=IjZ_8qbzsGI. (A-818.) As that video demonstrates, Smile Bright's services were performed in a comfortable, spa-type environment. Customers were invited to sit in a reclining salon-style chair, provided with over-the-counter teeth-whitening products in a pre-filled mouthpiece, and provided with instructions on how to insert the mouthpiece so that the teeth-whitening gel spread evenly on the teeth. (A-818–19.)

To enhance the whitening process, after the mouthpiece was inserted and the customer was reclined in the chair, a Smile Bright employee would then position a low-powered LED light that was attached to an adjustable arm in front of the

3

customer's mouth (A-819.)[1] Then the customer would simply relax for 20 minutes and listen to music until the light automatically shut off, indicating the end of the whitening process. (A-818, 820.)

Smile Bright's business model was popular and, by 2011, the company was thriving and on the verge of expansion. (A-820.) But in June 2011, the Connecticut State Dental Commission enacted a declaratory ruling regarding teeth-whitening services, the plain language of which seemed to prohibit multiple components of Smile Bright's business. (A-203 (stating that the practice of dentistry includes "advising individuals on the use of [teeth-whitening] trays," "instructing a customer on teeth whitening procedures or methods," and "utilizing instruments and apparatus such as enhancing lights").) Based on that ruling, the Connecticut Department of Public Health sent cease-and-desist letters to teeth whiteners throughout Connecticut, including Smile Bright, that repeated this broad language. (A-205.)

In response to the Department's cease-and-desist letter, Smile Bright stopped offering teeth-whitening services in Connecticut and filed this lawsuit, challenging the Dental Commission's declaratory ruling under the Due Process, Equal Protection, and Privileges or Immunities Clauses of the Fourteenth

---

[1] "LED" is an acronym for "light-emitting diode."

4

Amendment. (A-820–21; SPA-2.)[2] After Smile Bright filed suit, the Commission adopted an interpretation of its declaratory ruling that was far narrower than the plain language of that ruling. (SPA-10–13.) Under this new interpretation, the only activity of Plaintiff's that is prohibited is the positioning of an LED light in front of a customer's mouth. (SPA-13.) Non-dentist teeth whiteners are not prohibited, however, from either selling lights to customers for home use or from making lights available for customers to use where teeth-whitening products are purchased. (A-236–37, 260.) Thus, while it is perfectly legal for Smile Bright to allow untrained customers to position LED teeth-whitening lights in front of their own mouths, any Smile Bright employee who positions a light for a customer is guilty of the unlicensed practice of dentistry, a felony offense punishable by up to 5 years in jail or $25,000 in civil fines per customer. Conn. Gen. Stat. §§ 19a-17(a)(6), 20-114(a), 20-126, 53a-35a(8).

---

[2] Smile Bright was originally joined in this lawsuit by individual plaintiff Lisa Martinez, who voluntarily dismissed her claims on December 13, 2012. *See* Stipulation of Dismissal of Pl. Lisa Martinez, ECF No. 37. Following the dismissal of Ms. Martinez, Smile Bright stopped pursuing the Privileges or Immunities claim, because the U.S. Supreme Court has previously held that corporations may not assert claims under the Privileges or Immunities Clause. *See Hague v. Comm. for Indus. Org.*, 307 U.S. 496, 514 (1939) ("Natural persons, and they alone, are entitled to the privileges and immunities which Section 1 of the Fourteenth Amendment secures for 'citizens of the United States.'") (citing, *inter alia*, *Orient Ins. Co. v. Daggs*, 172 U.S. 557 (1899)).

## II.     Evidence Before the District Court.

### A.     Evidence regarding the safety of LED lights.

Smile Bright produced extensive, unrebutted evidence that every aspect of its services were safe, including the LED lights that are used in conjunction with their services. Smile Bright's expert, Dr. Martin Giniger, provided unrebutted testimony that the LED lights used in teeth whitening are very low energy and emit light over a narrow band of the visible spectrum. (A-786–87.) They generate little heat and no measureable collateral UV B or C radiation, making them no more harmful than a typical consumer flashlight. (A-787.) Moreover, there is no published literature showing that any person has ever been harmed as a result of being exposed to the type of low-powered LED bleaching lights used by non-dentists. (A-786–87.)

The undisputed facts further demonstrated that Dr. Giniger had conducted first-hand scientific experiments with several of the LED bleaching lights available to non-dentists and found none of them able to generate additional external heat energy change above 1°C (1.8°F). (A-787.) This is significant because, as Dr. Giniger noted, the dental literature shows that it is necessary to cause at least a 5.5°C (9.9°F) increase in the temperature of the tooth pulp to cause any possible transient tooth harm. (A-787.) As a result, Dr. Giniger concluded that "it would be

scientifically and practically impossible for these lights to cause any more harm than a household flashlight (in other words, no chance)." (A-787.)

With regard to the specific light Smile Bright uses, Dr. Giniger concluded that the light was "extremely safe" and has "no potential for human harm when used as directed." (A-790.) The light is "equivalent in strength to many home LED flashlights sold in drugstores and retail chains." (A-790.) Additionally, even more powerful lights are sold for home use. (A-790.)

The Commission did not depose Dr. Giniger, nor did the Commission identify an expert of their own to rebut Dr. Giniger's testimony. Instead, the Commission entered into evidence testimony that Jonathan C. Meiers, DMD, gave before the Commission when it conducted a hearing regarding the declaratory ruling. (A-17–26.) As the district court noted, "Dr. Meiers did not offer any of his own opinions on the safety of using light to enhance teeth whitening, and there is no indication in his testimony or otherwise that he has expertise in this area." (SPA-20.) Dr. Meiers did, however, discuss two articles in professional dental journals that discussed the safety of "various lights used for light-activated bleaching." (A-22–23.)

The articles cited by Dr. Meiers discuss a wide variety of teeth-whitening lights other than LED lights, including high-temperature lamps and lasers. Almost none of the statements in either article refer specifically to LED lights, and none

7

identify harms from the sort of low-powered LED lights used by Smile Bright and other similar teeth-whitening businesses. Indeed, the only statement regarding the risks of LED lights specifically is the following:

> Although LED systems do "not extend as far into the [infra-red] spectral range as QTH or plasma arc lamps do[,] . . . LED systems . . . are not equipped with an additional [infra-red] filter. A remaining concern is that there is still a portion of [infra-red] emission that inevitably also comes with LED's, because the so called 'wings' of the emission spectra of the LED's used extend into the [infra-red] region. Thermal pulp damage from LED-systems cannot be absolutely excluded and has to be taken into consideration, especially when high power LED's are used for a longer time period.

(A-150–51.)

Nothing in any of the articles cited by Dr. Meiers refutes or undermines Dr. Giniger's testimony (A-786–87) that the dental literature shows that *low-powered* LED lights, like those used by Plaintiff, are physically incapable of causing the sort of temperature change necessary to cause thermal pulp damage. Nothing in any of these articles refutes or undermines Dr. Giniger's testimony (A-789–90) that Smile Bright's LED teeth-whitening light is no more powerful or dangerous than a household flashlight. Nothing in any of these articles identifies any mechanism by which the supposed risks of low-powered LED whitening lights could vary upwards or downwards based on the identity of the person positioning those lights. And nothing in any of these articles undermines or refutes Dr. Giniger's testimony (A-789) that the presence of a non-dentist who is familiar with the teeth-whitening

process to assist teeth-whitening customers with that process can only enhance customer safety.

**B.    Evidence regarding the irrelevance of dental education for teeth whitening.**

In addition to testifying regarding the safety of LED teeth-whitening lights, Dr. Giniger also provided unrebutted testimony about the irrelevance of dental education to teeth whitening in general. Based on his experience as a dental educator and his review of the relevant literature, Dr. Giniger testified that teeth whitening is rarely, if ever taught in dental schools, and that not one of the 65 dental schools in North America has any clinical requirement for teeth whitening. (A-795–97.) In other words, to graduate from dental school it is not necessary to have even once positioned a teeth-whitening light in front of a patient's mouth. (*See* A-797.) In Dr. Giniger's experience, the absence of teeth whitening from dental-school curricula is attributable to the lack of available time in an already crowded curriculum and the fact that the techniques are so simple that no training is necessary. (A-795.)

Dr. Giniger analogized requiring dental students to learn about teeth whitening to requiring dermatology students to learn about make-up application. (A-796.) Indeed, he considers it even more irrational because—while there are no documented incidents of any person anywhere ever suffering permanent injury as a

9

result of teeth whitening—there are documented instances of people suffering permanent damage to their skin from the use of cosmetics. (A-796.)

Dr. Giniger's view of the irrelevance of dental education to teeth whitening is supported by the Defendant-Appellees' own practices. Despite requiring that individuals attend dental school in order to offer teeth-whitening services, neither the Connecticut Department of Public Health nor the Connecticut State Dental Commission requires aspiring dentists to demonstrate any experience with or proficiency in any aspect of teeth whitening, including the positioning of teeth-whitening lights. (Pl.'s Rule 56(a)(1) Statement at ¶ 81, ECF No. 49-2; Defs.' Rule 56(a)(2) Statement at ¶ 81, ECF No. 52-1.) Defendants do not require that applicants for dental licensure demonstrate that they studied teeth whitening in dental school. (Pl.'s Rule 56(a)(1) Statement at ¶ 82, ECF No. 49-2; Defs.' Rule 56(a)(2) Statement at ¶ 82, ECF No. 52-1.) Nor is any aspect of teeth whitening covered on any of the tests required for licensure as a dentist in Connecticut. (Pl.'s Rule 56(a)(1) Statement at ¶ 82, ECF No. 49-2; Defs.' Rule 56(a)(2) Statement at ¶ 82, ECF No. 52-1.)

### C. Evidence regarding the incentives of dentists to restrict competition.

While there is no evidence of *public* benefits from Connecticut's prohibition on non-dentists positioning teeth-whitening lights, it is clear that these restrictions on teeth whitening do confer a *private* benefit on licensed dentists. Smile Bright

charges between $75 and $100 for teeth-whitening services. (A-821.) This is substantially less than the amount charged by most dentists, including the members of the Dental Commission themselves. (A-268.) Moreover, the evidence indicated that the overwhelming majority of the complaints received by the Dental Commission concerning non-dentist teeth whitening came, not from consumers, but from licensed dentists or the Connecticut State Dental Association, which represents the interests of licensed dentists. (A-232–34.)

Similar facts in North Carolina led the Federal Trade Commission to conclude that the North Carolina State Board of Dental Examiners violated federal antitrust law when it ordered non-dentists to stop offering services that were identical to those offered by Smile Bright. *See In re N.C. Bd. of Dental Exam'rs*, No. 9343, slip op. at 1–5 (F.T.C. Dec. 7, 2011), *available at* http://www.ftc.gov/os/adjpro/d9343/111207ncdentalopinion.pdf, *aff'd sub nom. N.C. State Bd. of Dental Exam'rs v. FTC*, 717 F.3d 359 (4th Cir. 2013), *cert. granted*, 134 S. Ct. 1491 (2014). In that case, the FTC concluded that North Carolina's actions had the effect of harming competitors and consumers, resulting in higher prices for teeth-whitening services. *Id.* at 32 ("In addition to increasing prices, the Board's conduct deprived consumers of choice."); *see also* Fed. Trade Comm'n, *FTC Concludes North Carolina Dental Board Illegally Stifled Competition by Stopping Non-Dentists From Providing Teeth Whitening Services*

11

(Dec. 7, 2011), http://ftc.gov/opa/2011/12/ncdental.shtm (last visited Sept. 11, 2014).

## III.    The District Court's Opinion.

The district court, per Judge Michael Shea, acknowledged that the Dental Commission had, over the course of this lawsuit, retreated from its earlier, broad interpretation of its 2011 declaratory ruling, and that "the only remaining issue [was] whether the Constitution forbids a State from prohibiting a non-dentist from pointing a LED light at a customer's mouth during teeth whitening." (SPA-13.) Because this case does not involve a "suspect" or "quasi-suspect" classification, the court held that Plaintiff's claims under the Due Process and Equal Protection Clauses of the Fourteenth Amendment were subject to rational-basis scrutiny. (SPA-14.) Purporting to apply that standard, the district court denied Smile Bright's motion for summary judgment and granted the Commission's cross motion. (SPA-14–32.) The district court's unpublished opinion is available at *Martinez v. Mullen*, No. 3:11-cv-01787, 2014 WL 1315658, 2014 U.S. Dist. LEXIS 41837 (D. Conn. Mar. 28, 2014).

## SUMMARY OF THE ARGUMENT

Connecticut's prohibition on non-dentist teeth whiteners positioning LED lights in front of their customers' mouths is irrational and, hence, unconstitutional under the Due Process and Equal Protection Clauses of the Fourteenth

12

Amendment. The undisputed facts demonstrate that the low-powered LED lights that Smile Bright uses—and that are used by non-dentist teeth whiteners generally—have no potential for harm. They are, in fact, no more powerful or dangerous than household flashlights. Moreover, the Commission has taken the position that it is perfectly legal for non-dentist teeth whiteners to make LED lights available for use by their customers, provided that the customer is solely responsible for positioning the light. In other words, teeth-whitening lights may be positioned by fully licensed dentists or by untrained teeth-whitening customers, but may not be positioned by a Smile Bright employee. Yet it is not plausible or even conceivable that the risks of low-power teeth-whitening lights vary up or down depending on the identity of the person positioning them. Nor is it rational to require Smile Bright employees to attain eight years of higher education at a cost of tens of thousands of dollars, just so that they may assist with a procedure that the Commission itself admits may be performed by a totally untrained customer.

Remarkably, the district court disagreed, holding that Connecticut's policy survives rational-basis scrutiny. But that ruling cannot be squared with precedent from the U.S. Supreme Court or other federal courts, which demonstrates that the rational-basis test, while deferential, is not a rubber stamp. It is an actual standard of judicial review under which plaintiffs sometimes prevail. Specifically, plaintiffs in rational-basis cases prevail when they successfully demonstrate that there is

13

either no logical connection between the government's purported interest and the means it has adopted to pursue that interest, or that there is such an extreme mismatch between the costs and benefits of a regulatory scheme as to render the scheme irrational. Because Smile Bright demonstrated that Connecticut's policy fails either of these standards, the district court's ruling should be reversed.

**ARGUMENT**

As this Court recently recognized, the U.S. Supreme Court has long held that "while rational basis review is indulgent and respectful, it is not meant to be 'toothless.'" *Windsor v. United States*, 699 F.3d 169, 180 (2d Cir. 2012) (citing *Schweiker v. Wilson*, 450 U.S. 221, 234 (1981)), *aff'd*, 133 S. Ct. 2675 (2013). The district court essentially ignored that admonition, adopting an approach to rational-basis review so deferential that it is difficult to imagine how any government action could ever fail it. But as explained in Section I, below, the district court's application of the rational-basis test cannot be squared with the way that test is actually applied by the U.S. Supreme Court, by this Court, and by other federal courts. As explained in Section II, Connecticut's requirement that non-dentists acquire eight years of higher education before they may point a flashlight at a customer's teeth fails the rational-basis test.

## I. The Rational-Basis Test, While Deferential, Is Not a Rubber Stamp.

The District Court's ruling is replete with expansive statements about the deferential nature of the rational-basis test. (*See*, *e.g.*, SPA-1, 14, 19). And it is apparent that the district court viewed the rational-basis test as little more than a rubber stamp. But the district court's approach to rational-basis review cannot be reconciled with the fact that the Supreme Court sometimes concludes that plaintiffs win under rational-basis review.[3]

As explained below, rational-basis review is not a rubber stamp. It is a real, though deferential, standard of review, and the U.S. Supreme Court has articulated standards for when plaintiffs prevail under that review. Specifically, the Court has held that statutes fail rational-basis review where: (1) there is no logical connection

---

[3] *See United States v. Windsor*, 133 S. Ct. 2675, 2695 (2013); *id.* at 2706 (Scalia, J., dissenting) (noting that the Court relied on rational-basis review); *Lawrence v. Texas*, 539 U.S. 558, 578 (2003); *United States v. Morrison*, 529 U.S. 598, 614–15 (2000); *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 565 (2000); *Romer v. Evans*, 517 U.S. 620, 634–35 (1996); *United States v. Lopez*, 514 U.S. 549, 567 (1995); *Quinn v. Millsap*, 491 U.S. 95, 108 (1989); *Allegheny Pittsburgh Coal Co. v. Cnty. Comm'n*, 488 U.S. 336, 345 (1989); *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 447 (1985); *Hooper v. Bernalillo Cnty. Assessor*, 472 U.S. 612, 623 (1985); *Williams v. Vermont*, 472 U.S. 14, 24–25 (1985); *Metro. Life Ins. Co. v. Ward*, 470 U.S. 869, 880 (1985); *Plyler v. Doe*, 457 U.S. 202, 230 (1982); *Zobel v. Williams*, 457 U.S. 55, 64 (1982); *Chappelle v. Greater Baton Rouge Airport Dist.*, 431 U.S. 159, 159 (1977) (per curiam); *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973); *James v. Strange*, 407 U.S. 128, 141–42 (1972); *Lindsey v. Normet*, 405 U.S. 56, 77–78 (1972); *Mayer v. City of Chicago*, 404 U.S. 189, 196 (1971); *Reed v. Reed*, 404 U.S. 71, 76–77 (1971); *Turner v. Fouche*, 396 U.S. 346, 363–64 (1970). *See also Barletta v. Rilling*, 973 F. Supp. 2d 132, 136–40 (D. Conn. 2013); *Baccus v. Karger*, 692 F. Supp. 290, 299–300 (S.D.N.Y. 1988).

between the challenged law and any legitimate government interest; or (2) there is such an extreme mismatch between the costs and benefits of a regulatory scheme as to render that scheme irrational.

> **A.    Regulations fail the rational-basis test when there is no logical connection between the regulation and a legitimate government interest.**

To satisfy the rational-basis test it is not enough for the government merely to articulate a legitimate government interest; the government's regulation must also be rationally related to the promotion of that interest. *St. Joseph Abbey v. Castille*, 712 F.3d 215, 223 (5th Cir. 2013) ("[T]he State Board's chosen means must rationally relate to the state interests it articulates . . . ."). Moreover, as this Court has held, that relationship must be "plausible." *Beatie v. City of New York*, 123 F.3d 707, 712 (2d Cir. 1997).

U.S. Supreme Court precedent is instructive on the sorts of relationships that will fail this standard. In *Zobel v. Williams*, for example, new residents of Alaska challenged a state program that gave oil money only to Alaskans who had been residents prior to 1980. 457 U.S. 55, 56–57 (1982). Alaska asserted two reasons for bestowing a cash windfall on pre-1980 residents: (1) encouraging settlement in

16

sparsely populated Alaska; and (2) giving residents a stake in the prudent management of oil reserves. *Id.* at 61.[4]

The Supreme Court held that neither reason provided any logical support for the law. *Id*. at 62. First, if the goal was to encourage people to move to Alaska, it was patently illogical to pay oil money to *existing* residents while denying oil money to *new* residents. *See id*. Second, if the goal was to preserve resources by *including* residents in oil revenue, it was illogical to *exclude* many Alaskans from oil revenue based on an arbitrary date. *See id.* at 62-63. Thus, when a rational-basis challenge goes beyond a mere policy disagreement and identifies fundamental irrationalities in a proffered justification for a law, courts do not credit those rationales. Where every asserted rationale is logically refuted, courts should, and do, strike down the challenged law.[5]

---

[4] The State also asserted that the distinction served "to reward citizens for past contributions" to the State, which the Supreme Court had previously held was not in itself a legitimate state interest. *See id.* at 63.

[5] *See also Quinn*, 491 U.S. at 108 (holding that ability to grasp politics not logically connected to land ownership); *Allegheny*, 488 U.S. at 345 (finding disparities in tax rates so enormous as to be illogical); *Cleburne*, 473 U.S. at 449–50 (concluding that a home being too big is not logical basis for permit denial when identical homes were routinely granted permits); *Williams*, 472 U.S. at 24–25 (concluding that encouraging Vermont residents to make in-state car purchases not logical basis for tax on car that Vermont resident purchased out-of-state before becoming Vermont resident); *Moreno*, 413 U.S. at 534 (stimulating the agricultural economy not logically connected to whether people in a household are related or unrelated); *Mayer*, 404 U.S. at 196 (concluding that, if inability to pay is no basis to deny transcript to felony defendant, then inability to pay is no logical basis for denying transcript to misdemeanant); *Turner*, 396 U.S. at 363–64 (finding no rational interest underlying property-ownership requirement for political office).

Other federal courts have explicitly applied this sort of reasoning to occupational-licensing laws. In *St. Joseph Abbey v. Castille*, for example, the Fifth Circuit invalidated a state law that granted licensed funeral directors a monopoly on the sale of caskets. Despite the fact that the government defended the law by articulating legitimate government interests such as consumer protection and public health and safety, the plaintiffs prevailed by demonstrating that the law could not rationally advance those interests because, among other things, funeral directors were not required to have any special expertise in caskets and the law exempted caskets bought from online retailers. 712 F.3d at 220, 223–26; *accord Craigmiles v. Giles*, 312 F.3d 220 (6th Cir. 2002) (striking down Tennessee's funeral-director monopoly on casket sales).

**B.    Regulations fail the rational-basis test when there is an extreme, irrational mismatch between costs and benefits.**

In addition to striking down laws when there is no logical connection between the government's supposed ends and the means adopted to pursue those ends, the U.S. Supreme Court rejects statutory classifications where there is such an extreme mismatch between a law's alleged benefits and its demonstrable costs that no rational legislator would countenance them. In *Plyler v. Doe*, for example, the government asserted that denying public education to the children of illegal immigrants could help save government funds, which the Court rejected as a "wholly insubstantial [benefit] in light of the costs involved to these children, the

18

State, and the Nation" of creating a subclass of illiterates. 457 U.S. 202, 230 (1982).

The Court applied similar principles in *Allegheny Pittsburgh Coal Co. v. County Commission*, 488 U.S. 336 (1989). In *Allegheny*, the state of West Virginia used the most recent purchase price of land to assess property taxes, but because some property had not changed hands for decades this resulted in recent purchasers paying taxes as much as 35 times more than neighbors who had purchased long ago. *Id.* at 340–41. The county argued that, as a general proposition, purchase price was the most precise measure of property value, and that the wild disparities that resulted in some circumstances should be accepted as a necessary evil. *Id.* at 343. The Supreme Court, however, rightly refused to allow the county to impose gross disparities simply because doing so was in some vague sense easier for county officials. *Id.* at 345–46. Thus, the mere fact that some small benefits (like cost savings) could plausibly be attributed to an unequal classification will not save it from invalidation if it achieves those small benefits at the price of imposing grossly disproportionate burdens.[6]

---

[6] *See also James*, 407 U.S. at 141–42 (holding that the harm inflicted on debtors by denying indigent defendants exceptions to the enforcement of debt judgments was grossly disproportionate the state funds saved); *Lindsey*, 405 U.S. at 77–78 (holding that the cost savings from deterring a few frivolous appeals were insufficient to justify a surety requirement that allowed many frivolous appeals, blocked many meritorious appeals, and conferred a windfall on landlords); *Reed*, 404 U.S. at 76–77 (holding that attempting to reduce the workload of the probate courts by excluding women from service as administrators in certain cases would be unconstitutionally arbitrary).

**II.    It Is Not Rational to Require a Person to Have Eight Years of Higher Education Before They May Point the Equivalent of a Flashlight at Another Person's Mouth.**

Applying the rational-basis test as it has been applied by the U.S. Supreme Court, by this Court, and by other federal courts, Connecticut's prohibition on non-dentist teeth whiteners positioning LED lights cannot survive. As explained in Section A, below, it is implausible that the identity of the individual positioning a teeth-whitening light has any relationship to the safety of that light. Further, as explained in Section B, there is an irrational mismatch between the entirely illusory benefits of Connecticut's policy and the extreme costs it imposes on consumers and teeth-whitening entrepreneurs like Smile Bright.

**A.    It is not plausible that the identity of the individual positioning a teeth-whitening light has any relationship to the safety of that light.**

The undisputed facts demonstrate that the low-powered LED lights used by non-dentist teeth whiteners are safe. Moreover, the facts demonstrate that even if LED lights posed some risk to the public, that risk does not vary up or down based on the identity of the person positioning that light, whether it be a dentist (legal), a non-dentist teeth whitener (felony), or a totally untrained customer (legal). Those facts are sufficient to demonstrate that Connecticut's declaratory ruling is irrational and, hence, unconstitutional.

The facts of this case are more extreme than those in other cases in which federal courts, both in and outside the Second Circuit, have found no rational connection between an occupational-licensing scheme and a state's asserted interest. In *Baccus v. Karger*, for example, the United States District Court for the Southern District of New York invalidated a New York bar rule that prohibited aspiring lawyers from sitting for the bar if they began their legal education before the age of 18. 692 F. Supp. 290 (S.D.N.Y. 1988). Although the New York Board of Law Examiners argued that the restriction was critical to ensuring that applicants had sufficient maturity to practice law, the court rejected this unsupported assertion, noting that "[l]aw schools are not in the maturity business," and concluding that the government's interest was sufficiently served by a separate requirement prohibiting aspiring lawyers from sitting for the bar examination before they were 21 years old. *Id.* at 299–300. *Baccus* is noteworthy because legal education is directly relevant to the core practice of law that the plaintiff in that case wished to engage in. In this case, by contrast, dental education is entirely irrelevant to the positioning of teeth-whitening lights. (A-795–97; Pl.'s Rule 56(a)(1) Statement at ¶¶ 81–85, ECF No. 49-2; Defs.' Rule 56(a)(2) Statement at ¶¶ 81–85, ECF No. 52-1.).

Federal courts have invalidated occupational-licensing schemes that are not rationally related to a legitimate government interest even when the state has

21

asserted an interest in protecting public health and safety. In *Cornwell v. Hamilton*, the United States District Court for the Southern District of California considered a challenge by an African hair braider to California's cosmetology licensing scheme and found that scheme to be unconstitutional. 80 F. Supp. 2d 1101 (S.D. Cal. 1999). The court examined the scope of the braider's activities, the scope of the cosmetology curriculum California forced upon the braider, and the relevance of the curriculum to the scope of the braider's activities. *Id.* at 1107–18. The court concluded that it was irrational to require hair braiders to undertake 1,600 hours of cosmetology training when only 110 of those hours were even arguably applicable to promoting health and safety in hair braiding. *Id.* at 1109–10. The United States District Court for the District of Utah reached the same conclusion in another recent hair-braiding case, concluding that Utah's 2,000-hour requirement for cosmetologists was unconstitutional as applied to an African hair braider when, at most, 20 to 30 percent of that time was applicable to hair braiding. *See Clayton v. Steinagel*, 885 F. Supp. 2d 1212, 1215 (D. Utah 2012).

In this case, by contrast, the educational requirement is vastly longer and more expensive than those in *Cornwell* or *Clayton*, requiring eight years of higher education at a cost of tens of thousands of dollars, and the proportion of that education that is relevant to the positioning of teeth-whitening lights is vastly smaller (if not nonexistent). (A-795–97; Pl.'s Rule 56(a)(1) Statement at ¶¶ 81–85,

22

ECF No. 49-2; Defs.' Rule 56(a)(2) Statement at ¶¶ 81–85, ECF No. 52-1.) A regulation that mandates extensive knowledge in such a vast amount of irrelevant information cannot be said to "have a rational connection with the applicant's fitness or capacity" to engage in the chosen occupation. *Schware v. Bd. of Bar Exam'rs*, 353 U.S. 232, 239 (1957). Thus, just as in *Cornwell* and *Clayton*, Connecticut has improperly adopted a regulatory scheme that "treats persons performing different skills as if their professions were one and the same, i.e., it attempts to squeeze two professions into a single, identical mold." *Cornwell*, 80 F. Supp. 2d at 1103.

The district court attempted to distinguish *Cornwell* and *Clayton* on the grounds that "even assuming that the practice at issue [in those cases] carried some risk to public health, the licensing statutes, as applied to the plaintiffs, would do nothing to limit that risk." (SPA-28.) But the district court has precisely described the situation here: Even assuming that the practice of pointing a low-powered LED light at a person's teeth carried some risks—which the record shows it does not— dental licensure does nothing to mitigate that risk. Neither the district court, nor the Commission has suggested that there is any mechanism by which some hypothetical risk from teeth-whitening lights varies up or down based on the skill or education of the person pointing the light. There is no evidence, and no reason to believe, that there is a "safe way" and a "dangerous way" to point a flashlight at

23

someone's teeth, or that eight years of higher education—none of which concerns any aspect of teeth whitening—is required to distinguish between the two.

This Court's ruling in *Beatie v. City of New York*, 123 F.3d 707 (2d Cir. 1997), upon which the district court heavily relied, is not to the contrary. In that case, this Court rejected a challenge brought by a cigar aficionado to a New York anti-smoking law. "The essence of [the plaintiff's] argument [was] that although numerous studies show that exposure to secondary *cigarette* smoke can be harmful to nonsmokers, no reliable scientific study has directly shown secondary *cigar* smoke to have comparably adverse effects." *Id.* at 709. In defense of the law, the City "identifie[d] various materials on the basis of which it might reasonably be thought that both cigars and cigarettes are harmful and that placing limits on cigar smoking would protect the health of nonsmokers." *Id.* at 712. The plaintiff did not refute this evidence, but merely questioned its "persuasive weight." *Id.* at 713.

This case is easily distinguishable from *Beatie*; indeed, it is almost the precise opposite of that case. In *Beatie*, the government argued that products made from identical material (tobacco) posed similar risks to public health. The government in that case produced actual, admissible evidence to support its position, and the plaintiff concededly could not rebut that evidence. In this case, by contrast, the district court concluded that there is a rational basis for believing that identical teeth-whitening lights pose *different* risks based on the identity of the

24

person positioning those lights. But neither the Dental Commission nor the district court has articulated any method by which such differential risks are even conceivable, let alone "plausible." *Beatie*, 123 F.3d at 712; *see also id.* ("Supreme Court jurisprudence now informs us that when reviewing challenged social legislation, a court must look for 'plausible reasons' for legislative action, whether or not such reasons underlay the legislature's action.").

The district court's reliance on *Jones v. Schneiderman*, 888 F. Supp. 2d 421 (S.D.N.Y. 2012), is no more persuasive. That case involved a constitutional challenge to a state prohibition on mixed-martial-arts ("MMA") competitions. By their very nature, and as was undisputed in that case, MMA competitions pose genuine risks to their participants. So it is no surprise that the trial court in *Schneiderman* concluded that "the New York legislature had a sufficient basis to speculate that professional MMA posed a substantial threat to fighters' health and safety." *Id.* at 428.

*Schneiderman* is not remotely comparable to this case. It is entirely plausible to believe that competitions in which people are placed into "choke holds" and "submission holds," *id.*, expose their participants to more danger than if they were not allowed to engage in those competitions. But it is not plausible, or even conceivable, that allowing non-dentist teeth whiteners to position lights that are no more powerful than flashlights in front of customers' mouths exposes those

25

customers to greater danger than if the customers themselves positioned those lights. On the contrary, Plaintiff-Appellants provided unrebutted expert testimony that the presence of a non-dentist familiar with the teeth-whitening process can only enhance the safety of that process. (A-789; *see also* A-790 ("There is no conceivable mechanism by which applying products at the mall can be more dangerous than applying to teeth at home, since the products and lights that are available from either source are materially indistinguishable.").) Accordingly, as applied to Smile Bright, there is no rational connection between the government's ends and the means chosen to pursue those ends.

**B. Even if such a relationship were plausible, the costs of Connecticut's policy are so disproportionate to its illusory benefits as to be irrational.**

As explained in the preceding section, Connecticut's prohibition bears no plausible connection to the promotion of public health or safety. This prohibition does, however, impose high costs on both non-dentist teeth whiteners and consumers. As demonstrated by Dr. Giniger's unrebutted expert testimony, the public benefits of prohibiting Smile Bright's employees from positioning teeth-whitening lights for their customers are nonexistent. (A-766–68.) The costs of Connecticut's prohibition, however, are extreme. For non-dentists who wish to be able to offer teeth-whitening services, the cost amounts to eight years of higher education and tens of thousands of dollars in tuition in order to acquire the

education necessary to become a licensed dentist in Connecticut. (A-821.) For consumers, the cost amounts to fewer teeth-whitening options and the necessity of paying higher prices for these reduced options. (*Compare* A-268, *with* A-821.) Accordingly, because the alleged benefits of Connecticut's prohibition on non-dentist teeth whitening are "wholly insubstantial in light of the costs," *Plyler*, 457 U.S. at 230, Connecticut's regulatory scheme is unconstitutionally irrational.

The district court responded to this argument below by attempting to distinguish a single case upon which Plaintiff-Appellant relied—*Plyler v. Doe*—and by suggesting that the harm to Plaintiff-Appellant was minimal. Neither of these efforts succeeds.

With regard to *Plyler*, the district court denied that the Supreme Court actually considered the costs and benefits of the policy challenged in that case, dismissing the Court's specific reference to both "costs" and "benefits" as a mere "rhetorical device" rather than the formulation of a legal standard. (SPA-30.) But that interpretation of *Plyler* cannot be squared with a plain reading of that decision. *See Plyler*, 457 U.S. at 230. Moreover, the district court simply ignored the other decisions, cited above, all of which involved the Supreme Court taking explicit account of the costs and benefits of challenged policies under the rational-basis test. *See supra* at 13–14 & n.6.

27

The district court's second approach—denying that Connecticut's prohibition imposes costs on Smile Bright and similar teeth-whitening companies (SPA-30–31)—fares no better. This argument ignores the practical impact of the Dental Commission's declaratory ruling. Smile Bright's owners cannot monitor their employees at all times, and they quite reasonably do not want to risk felony convictions for themselves or for their employees if an employee innocently assists a customer—who is reclined in a salon-style chair—in positioning a teeth-whitening light. The only way for them to remove that threat is to undertake the expense of becoming fully licensed dentists, a process that requires eight years of higher education and costs tens of thousands of dollars. And because no rational person would ever undertake the expense of dental school merely for the right to offer low-priced teeth-whitening services, Smile Bright is effectively barred from operating. That harm is real, and it is no less severe than others that the Supreme Court has explicitly held outweighed minimal or illusory benefits. *See*, *e.g.*, *Lindsey v. Normet*, 405 U.S. 56, 77–78 (1972) (holding that the harm of Oregon's requirement that defendants in landlord-tenant disputes post two sureties for the rental value of property outweighed the supposed benefits of that requirement).

## CONCLUSION

Smile Bright has demonstrated that Connecticut's prohibition on non-dentists positioning low-powered teeth-whitening lights for their customers is not

rationally related to any legitimate government interest. Indeed, the only imaginable interest to which it is related is the illegitimate interest in protecting licensed dentists from competition by making life more difficult for their competitors. *Cf. Craigmiles*, 312 F.3d at 228 ("Finding no rational relationship to any of the articulated purposes of the state, we are left with the more obvious illegitimate purpose to which [the] licensure provision is very well tailored. The licensure requirement imposes a significant barrier to competition . . . ."). That is not a constitutional use of government power. Accordingly, the district court's decision should be reversed, and this case should be remanded with instructions to enter summary judgment for Plaintiff-Appellant.

Dated: September 12, 2014

Respectfully submitted,

**INSTITUTE FOR JUSTICE**

/s/ Paul M. Sherman
Paul M. Sherman (DC Bar No. 978663)*
Dana Berliner (DC Bar No. 447686)*
901 North Glebe Road, Suite 900
Arlington, VA 22203-1854
Tel: (703) 682-9320
Fax: (703) 682-9321
Email: psherman@ij.org,
dberliner@ij.org
*Attorneys for Plaintiffs*
*\*Admitted Pro Hac Vice*

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on this 12th day of September, 2014, I caused this Brief of Appellant and Appendix to be filed electronically with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

> Daniel R. Shapiro
> CONNECTICUT OFFICE OF
>   THE ATTORNEY GENERAL
> 55 Elm Street, Post Office Box 120
> Hartford, Connecticut  06106
> (860) 808- 5210
>
> *Counsel for Appellees*

I further certify that on this 12th day of September, 2014, I caused the required number of bound copies of the Brief of Appellant and Appendix to be filed with the Clerk of the Court via UPS Next Day Air.

/s/ Paul M. Sherman
*Counsel for Appellant*

## CERTIFICATE OF COMPLIANCE

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

    [ X ] this brief contains [*6,909*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

    [   ] this brief uses a monospaced typeface and contains [*state the number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    [ X ] this brief has been prepared in a proportionally spaced typeface using [*Corel WordPerfect 12*] in [*14pt Times New Roman*]; *or*

    [   ] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].

Dated: <u>September 12, 2014</u>            /s/ Paul M. Sherman
                                                *Counsel for Appellant*

# SPECIAL APPENDIX

# SPECIAL APPENDIX
## TABLE OF CONTENTS

**Page**

**Memorandum of Decision of
The Honorable Michael P. Shea
Re: Granting Defendants' Motion for Summary Judgment and
Denying Plaintiff's Motion for Summary Judgment**
　　　　filed March 28, 2014 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SPA-1

**Judgment in a Civil Case**
　　　　filed March 31, 2014 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SPA-33

## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| LISA MARTINEZ and SENSATIONAL SMILES, LLC d/b/a SMILE BRIGHT,<br><br>    Plaintiffs,<br><br>    v.<br><br>JEWEL MULLEN, JEANNE P. STRATHEARN, LANCE E. BANWELL, ELLIOT S. BERMAN, PETER S. KATZ, STEVEN G. REISS, BARBARA B. ULRICH, and MARTIN UNGAR,<br><br>    Defendants. | No. 3:11-cv-01787 (MPS) |

## MEMORANDUM OF DECISION

This case, which involves the State of Connecticut's regulation of teeth-whitening services provided by non-dentists, illustrates the great deference courts must afford governmental regulation under the doctrine known as "rational basis scrutiny." The governmental regulation at issue here is a rule that only a licensed dentist may shine a "light emitting diode" ("LED") lamp at the mouth of a consumer who seeks to whiten her teeth. Although the State has not submitted any clearly admissible evidence to support this regulation, and although Plaintiff – a teeth-whitening business that does not employ a licensed dentist – has submitted substantial evidence questioning the purpose and efficacy of the regulation, there is some literature that suggests that shining a LED light at a person's mouth poses some risk to that person's oral health. That is enough to provide "a reasonably conceivable state of facts" for a rule allowing only licensed dentists – who are trained and certified in the area of oral health – to shine a LED light at a consumer's mouth, and thus to turn away Plaintiff's rational basis challenge under the very deferential standards that this Court must apply. *See Fed. Commc'n Comm'n v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993) ("In areas of social and economic policy, a statutory

classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is *any reasonably conceivable state of facts* that could provide a rational basis for the classification." (emphasis added)).

Plaintiff Sensational Smiles, LLC, d/b/a Smile Bright ("Plaintiff")[1] brings this action under 42 U.S.C. § 1983 against the Defendants, the Commissioner of the State of Connecticut Department of Public Health and the members of Connecticut State Dental Commission (the "Commission" and collectively, "Defendants"), seeking declaratory and injunctive relief against the enforcement of a June 8, 2011 Declaratory Ruling of the Commission (the "Declaratory Ruling" or "Ruling"), which classified certain teeth-whitening services as the practice of dentistry within the meaning of Conn. Gen. Stat. Sec. 20-123. Plaintiff is a commercial entity unlicensed as a dentist and formerly engaged in the sale of teeth-whitening products and services, services the Commission classified as the practice of dentistry in its Declaratory Ruling. Plaintiff contends that the Declaratory Ruling violates the Equal Protection and Due Process Clauses as applied to it because there is no rational relationship between what everyone acknowledges is a legitimate government interest – the oral health of the public – and the restrictions set forth in the Declaratory Ruling. Plaintiff seeks a declaratory judgment declaring that those restrictions, as applied to its teeth-whitening services, are unconstitutional, and a permanent injunction barring their enforcement against Plaintiff.

At this point, however, the only restriction at issue is the limitation on the use of LED lights during teeth whitening. Judicial and evidentiary admissions in this litigation have made clear that Plaintiff does not seek to engage in some of the other teeth-whitening activities restricted by the Declaratory Ruling, and that the State concedes that Plaintiff is free to engage in

---

[1] On December 13, 2012, the parties filed a stipulation of dismissal without prejudice with respect to a second plaintiff, Lisa Martinez. (*See* Stipulation of Dismissal [Dkt. # 37].)

2

the remaining activities purportedly restricted by the Ruling, as they do not constitute the practice of dentistry. Both sides agree that the remaining issue is narrow and involves who may actually direct a LED light at a consumer's mouth during the teeth-whitening process, and both sides have moved summary judgment. The Court denies Plaintiff's motion and grants Defendants' motion because, as explained below, Plaintiff has failed "to negative every conceivable basis which might support [the regulation allowing only dentists to shine a LED lamp at a consumer's mouth during teeth-whitening services.]" *Beach Commc'ns*, 508 U.S. at 315 (internal quotation marks and citations omitted).

## I. BACKGROUND

### A. Procedural History

The Commission is a statutorily-created body[2] that advises and assists the Commissioner of Public Health in issuing dental regulations "to insure proper dental care and the protection of public health, considering the convenience and welfare of the patient, methods recommended by the canon of ethics of the Connecticut State Dental Association and the American Dental Association and accepted health standards as promulgated by local health ordinances and state statutes and regulations." Conn. Gen. Stat. § 20-103a(a). The Commission and the Commissioner of Public Health also are empowered to take disciplinary action against licensed and unlicensed dental practitioners. *See Id.* §§ 20-114; 19a-17; 19a-11. Any unlicensed person who practices dentistry shall be guilty of a class D felony for "each instance of patient contact or consultation" that violates the law. *Id.* § 20-126. The penalties for each violation include imprisonment of 1 to 5 years and a fine of up to $5,000. *Id.* §§ 53a-35a(1)(A)(8); 53a-41.

---

[2] The Commission is comprised of nine members appointed by the Governor, six of whom are practitioners in dentistry and three of whom are members of the public. *See* Conn. Gen. Stat. § 20-103a(a).

3

On September 8, 2010, the Commission initiated a declaratory ruling proceeding to consider whether "teeth whitening practices and/or procedures constitute the practice of dentistry as set forth in § 20-123 of the Connecticut General Statutes … and what teeth whitening practices and/or procedures must be performed only by a licensed dentist or persons legally authorized to work under the supervision of a licensed dentist." (Declaratory Ruling at 1 [Dkt. # 1-1].)

On November 16, 2010, the Commission published a Notice of Hearing in the *Connecticut Law Journal*, setting the hearing dates of December 8 and 9, 2010. The Notice of Hearing was also sent to the Connecticut State Dental Association, the Connecticut Dental Hygienist Association, the Connecticut Dental Assistants Association, the American Dental Association, the Connecticut Department of Public Health, the Connecticut Department of Consumer Protection, and the Council for Cosmetic Teeth Whitening. (*Id.*)

The Commission granted requests by the Connecticut State Dental Association, the Connecticut Dental Hygienist's Association, and Connecticut Dental Assistants Association to be designated as parties to the proceeding, and representatives of these associations appeared at the hearing, which was held on December 8, 2010. (*Id.* at 1-2.) During the hearing, the Commission considered exhibits and pre-filed testimony, which were adopted under oath at the hearing. Also, the witnesses were available for questioning and cross-examination. (Declaratory Ruling at 2.)

## B. Declaratory Ruling

On June 8, 2011, the Commission issued the Declaratory Ruling that is the subject of this action. (*Id.* at 6.) After a summary of the procedural history, the Ruling sets forth "Findings of Fact." The factual findings relevant to the present, narrowed dispute over the use of LED lights are as follows:

4

4.      Tooth discoloration can be the result of numerous factors including smoking, coffee, tea or any other type of compound taken orally that can stain teeth.

5.      Metabolic disease, trauma to the tooth pulp and certain drugs taken when the teeth were being formed can also cause discoloration.

6.      Tooth whitening products contain potent oxidizing elements that, if applied incorrectly, can cause serious burns.

7.      Determining the cause of discoloration is a significant factor in determining whether attempting to alter the color of a tooth with chemicals will have any effect on improving the appearance of the teeth.

                                    *    *    *

13.     A custom tray for home use prepared by a licensed dentist attempts to minimize tissue burns by creating a custom fit tray that limits the contact of the oral tissue with the bleaching gel.

14.     Many of the publications which have analyzed the effect of light during office bleaching procedures have indicated that there is little or no difference in the effectiveness of the bleaching products with concentrated light.  There are however, risks associated with the use of light.

15.     There should be adequate eye and skin protection for the patient and the operator of the light if it is being used to enhance the product in a bleaching procedure.

16.     Pulpal irritation, tooth sensitivity and lip burns have been reported to occur at a higher rate with the use of bleaching lights.

17.     The decision of whether to recommend or apply bleaching agents and/or bleaching lights to a particular person's teeth requires significant diagnostic expertise and skills, in part, to allow the provider to distinguish between pathological versus non-pathological causes of tooth discoloration.  The presence of existing tooth colored restorations, failing restorations, caries, ceramic crowns, cracks in teeth and exposed root surfaces all need to be identified and evaluated before such bleaching procedures are attempted.

(*Id.* at 3-4 (internal citations omitted).)  These findings were based on the testimony of two

dentists, Dr. Jon Davis and Dr. Jonathan C. Meiers.  The Commission described Dr. Meiers as

"an expert in the field of dentistry" who has "expertise in the field of teeth whitening." (*Id.* at 3.) The Commission found the testimony of both Dr. Davis and Dr. Meiers to be "reliable and credible." (*Id.*)

After making its findings of fact, the Commission discussed which teeth-whitening procedures constitute the practice of dentistry:

> Teeth whitening procedures constitute the practice of dentistry if the procedures involve the diagnosis, evaluation, prevention or treatment of an injury or deformity, disease or condition of the oral cavity (such as discoloration). When such evaluation, diagnosis, prevention or treatment is done by a person other than a licensed dentist, it violates section 20-123 of the Statutes unless a person is merely selling whitening products that are otherwise legal to sell. For example, the selling of teeth whitening gels of differing strengths by non-licensed persons is not, by itself, the practice of dentistry. It becomes the practice of dentistry when such unlicensed person either uses light in an attempt to enhance the product's effectiveness or a person conducts an analysis of that person's individual needs based upon an examination or other evaluation.
>
> Although any case brought before the Commission will be judged based upon the totality of circumstances, as a general rule actual application of a tooth whitening gel to another person by a person or employee of a company constitutes the practice of dentistry. Evaluating, assessing, or diagnosing discoloration of teeth constitutes the practice of dentistry. Providing personalized instruction to a consumer and instructing a person based on an assessment or supervising the use and application of tooth bleaching or lightening fluids, pastes, gels, solutions, or other agents to that person's teeth to improve or change the color of the teeth constitutes the practice of dentistry. However, the selling of over the counter teeth whitening products of differing strengths does not constitute the practice of dentistry if the seller is not evaluating a particular patient and recommending products based upon an examination or evaluation of a particular patient/customer.
>
> Assessing, fabricating, customizing, selecting, or advising the selection of tooth trays used to apply products that lighten or whiten teeth constitutes the practice of dentistry. *Applying a light source or other light assisted bleaching systems, including but not limited to* <u>light emitting diode (LED)</u>*, halogen lamps, plasma arc lamps, metal halide lamps, and lasers that result in the lightening or whitening teeth to enhance the tooth whitening process constitutes the practice of dentistry.*

(*Id.* at 5-6 (emphasis added).)

6

In its "Conclusion," the Commission stated as follows:

> The Commission adopts the following Declaratory Ruling and has determined that teeth whitening services involve the practice of dentistry when they include: (1) assessing and diagnosing the causes of discoloration; (2) making recommendations of how to perform teeth whitening; (3) customizing treatment; (4) utilizing instruments and apparatus such as enhancing lights[;] (5) selecting or advising individuals on the use of trays; (6) preparing or making customized trays for individuals; (7) applying teeth whitening products to the teeth of a customer; (8) instructing a customer on teeth whitening procedures or methods; or, (9) other activities as discussed in this declaratory ruling.

(*Id.* at 6.)

### C.     Cease and Desist Letter

On July 11, 2011, the Connecticut State Department of Public Health, through its "Office of Practitioner Licensing and Investigations," sent Plaintiff a letter advising it of the issuance of the Declaratory Ruling, requesting that Plaintiff "voluntarily cease the practice of offering teeth whitening services," and warning it that "[s]hould you choose to continue to offer these treatments at your facility, the Department of Public Health will consider proceeding with legal action in this matter."  (July 11, 2011 Letter (hereinafter the "Cease and Desist Letter") [Dkt. #49-4, Ex. 2].)[3]  The Cease and Desist Letter did not specify which services offered or performed by Plaintiff constituted the practice of dentistry or which services Plaintiff had to cease and desist from providing.  It did, however, request that Plaintiff provide "written verification" that it would "comply with the intent of the Declaratory Ruling…."  (*Id.*)

### D.     Plaintiff and Its Claims

Plaintiff, Sensational Smiles, LLC, d/b/a Smile Bright, is a Connecticut limited liability corporation co-owned by Stephen Barraco – the recipient of the Cease and Desist Letter – and Tasos Kariofyllis.  (*See* Compl. at ¶ 6 [Dkt. # 1].)  Neither Mr. Barraco nor Mr. Kariofyllis is a

---

[3] The letter is addressed to "Stephen Barraco, Smile Bright Enfield Square Mall."  Mr. Barraco is co-owner of Plaintiff, as discussed below.

7

licensed dentist.  (*Id.* at ¶ 56.)  Prior to the Declaratory Ruling, Plaintiff sold "custom-branded teeth-whitening products for use in spas and salons.  Smile Bright co-owner Stephen Barraco would also take appointments to perform teeth-whitening services at a salon in Hamden, Connecticut."  (*Id.* at ¶ 49.)  Plaintiff's teeth-whitening services "were limited to providing customers a prepackaged teeth-whitening product; instructions on how to apply the product to their own teeth; a chair to sit in while using the product; and an enhancing light."  (*Id.* at ¶ 50.)

Plaintiff alleges that, in response to the Declaratory Ruling, it "stopped selling products for use in spas and salons and stopped providing teeth-whitening services because Messrs. Kariofyllis and Barraco were unwilling to risk having to pay tens of thousands of dollars in fines or going to jail."  (*Id.* at ¶ 51.)  Plaintiff did, however, continue to sell teeth-whitening products for home use, products that Plaintiff alleges are "identical" to the products it sold for use in salons.  (*Id.* at ¶ 53.)  Defendants have acknowledged that the sale of such products for home use does not constitute the practice of dentistry.  (Defs.' Mem. in Supp. of Mot. for Summ. J. at 2 [Dkt. # 48-2].)  Plaintiff alleges that it "still has the equipment from its business, including whitening products, chairs, and lights," and it would "immediately begin taking steps to reestablish its business if it were legal to do so."  (Compl. at ¶ 54.)

On November 6, 2011, Plaintiff initiated this action seeking declaratory and injunctive relief against the enforcement of the Declaratory Ruling.  Plaintiff claims that the Declaratory Ruling is unconstitutional because it violates Plaintiff's "constitutional right to earn an honest living free from government regulations that serve no legitimate governmental interest."  (*Id.* at ¶

8

1.)  More specifically, Plaintiff alleges that the Declaratory Ruling violates the Equal Protection

and Due Process Clauses of the Fourteenth Amendment to the U.S. Constitution. [4]  (*Id.*)

In its equal protection argument, Plaintiff alleges that the Declaratory Ruling is

unconstitutional for three reasons: (1) "there is no rational reason for the distinction between

persons who sell customers a product that they will apply to their own teeth at home, who are not

regulated under the Dental Practice Act, and persons who sell customers an identical product that

they will apply to their own teeth in a shopping mall or at a salon, whom Connecticut considers

to be engaged in the practice of dentistry" (Compl. at ¶ 73); (2) "there is no rational reason for

the distinction between persons who sell customers teeth-whitening products that the customers

will apply to their own teeth, whom Connecticut considers to be engaged in the practice of

dentistry, and persons who perform procedures like tongue piercing, who are not regulated under

the Dental Practices Act" (*id.* at ¶ 74); and (3) "there is no rational reason for the distinction

between Plaintiff['s] provision of in-person instruction to customers on how to apply teeth-

whitening products to their own teeth, which Connecticut considers to be the practice of

dentistry, and the provision of written instructions online or packaged with identical teeth-

whitening products, which is not regulated under the Dental Practice Act" (*id.* at ¶ 75).

Plaintiff also argues that the Declaratory Ruling violates its substantive due process rights

because (1) "[t]here is no legitimate governmental interest for the application of the Dental

Practice Act to teeth-whitening services like those offered by Plaintiff[ ]" (*id.* at ¶ 79) and (2)

even if there were a legitimate governmental interest, "[t]he application of the Dental Practice

---

[4] Prior to the dismissal of Plaintiff Lisa Martinez, Ms. Martinez also asserted a claim that the Declaratory Ruling violates the Privileges and Immunities Clause of the Fourteenth Amendment to the U.S. Constitution.  (Compl. ¶ 84.)  Following the stipulated dismissal of Plaintiff Martinez, that claim was withdrawn.  (*See* Pl.'s Resp. to Defs.' Mot. for Summ. J. at 8 n.4 [Dkt. # 53].)

Act to teeth-whitening services like those offered by Plaintiff[ ] is not rationally related [to that interest] . . .." (*id.* at ¶ 80). As noted, Plaintiff seeks a declaratory judgment that the Dental Practice Act, as construed by the Commission in the Declaratory Ruling, violates the Due Process and Equal Protection Clauses as applied to Plaintiff's business, and a permanent injunction barring enforcement of the Act against it. [5] Plaintiff also seeks attorneys' fees, costs, and expenses. (*Id.* at 15, Prayer for Relief.)

### E. Narrowing the Issues

Plaintiff has not challenged all aspects of the Declaratory Ruling as its business did not seek to provide some of the services described in the Ruling. For example, Plaintiff did not "attempt[ ] to diagnose the underlying cause of any tooth discoloration" (*id.* at ¶ 8), prepare or make customized trays (*id.* at ¶ 15 ("trays were one-size-fits all")), customize treatment (*id.* at ¶ 4 ("the whitening process was the same [for all customers]")), or apply teeth whitening products to the teeth of the customer (*id.* at ¶ 22 ("application of the teeth-whitening product itself was performed entirely by the customer")). Nonetheless, at the outset of this litigation, and based on a literal reading of the Ruling, Plaintiff believed that the Declaratory Ruling barred several of its services as the unlicensed practice of dentistry, and thus initially challenged several elements of the Ruling. (*See* Barraco Decl. at ¶ 29 [Dkt. # 49-8] ("The ruling named several things we did as now being the practice of dentistry, including 'making recommendations of how to perform teeth

---

[5] At times, Plaintiff appears to be seeking broader relief on behalf of other, unnamed teeth-whitening businesses. (*See*, *e.g.*, Compl. at 15, Prayer for Relief (seeking declaratory judgment with respect to "teeth-whitening services like Plaintiffs'" and injunction forbidding future enforcement "against Plaintiffs and persons providing teeth-whitening services like Plaintiffs'.").) Plaintiff did not bring this case as a class action under Rule 23, however, and lacks standing to assert claims or to seek relief on behalf of other teeth-whitening businesses. This Court's ruling is thus limited to the factual circumstances relating to Plaintiff's teeth-whitening business.

whitening,' 'utilizing instruments and apparatus such as enhancing lights,' 'advising individuals on the use of trays,' and 'instructing a customer on teeth whitening procedures or methods.'").)

During the course of discovery and in briefs filed in this action, however, the Connecticut Attorney General, as counsel for the Commission, has agreed that certain teeth-whitening services that might fall within the literal terms of the Ruling do not constitute the practice of dentistry and are thus not off limits to Plaintiff. These include the following: (1) "merely selling whitening products that are otherwise legal to sell"; (2) "[p]roviding a client with the instructions that are provided by the manufacturer of the product"; (3) "provid[ing] the purchaser of a self-administered teeth-whitening product with a place to use and dispose of the product"; (4) "us[ing] a shade guide to demonstrate to a customer the shade of their teeth either before or after the use of a teeth-whitening product"; and (5) "simply making a LED light available to a client for use by the client with a self-administered teeth-whitening product at the place of purchase". (Defs.' Disc. Resp. Nos. 8-11, 13 [Dkt. # 49-4].)

The Attorney General's stipulations in the course of this litigation have narrowed some of the broad language in the Declaratory Ruling, and might have saved the parties substantial time and expense had they been made at the outset of the litigation.[6] For example, while the Ruling states that "teeth whitening services involve the practice of dentistry when they include … utilizing instruments and apparatus such as enhancing lights," the Attorney General acknowledges that this language does not prohibit the Plaintiff from making a LED light available to a client for use by the client "with a self-administered teeth-whitening product" on Plaintiff's business premises. In other words, Plaintiff may lawfully operate a salon or spa at

---

[6] Connecticut's Attorney General has "general supervision over all legal matters in which the state is an interested party," is the State's designated legal representative in litigation matters, and is charged by statute with "giv[ing] his opinion upon questions of law" to the state legislature, executive branch agencies, and boards and commissions. Conn. Gen. Stat. § 3-125.

which a client sits in a chair provided by Plaintiff and points a LED light provided by Plaintiff at her own mouth while applying a teeth-whitening product; it is just that Plaintiff cannot actually point the light at the client's mouth. (Hr'g on Mot. for Summ. J. Tr. at 7-9.) In addition, while the Ruling would broadly prohibit non-dentists from "instructing a customer on teeth whitening procedures or methods," the Attorney General retreated from this position, agreeing in its summary judgment papers and at oral argument that Plaintiff would not violate the statutes related to the practice of dentistry by making recommendations to customers as to how to perform teeth whitening, advising individuals on the use of trays, and instructing a customer on teeth-whitening procedures or methods. (Pl.'s L. Civ. R. 56(a)1 Statement ¶ 95 [Dkt. # 49-2]; Defs.' L. Civ. R. 56(a)2 Statement ¶ 95 [Dkt. # 52-1]; Hr'g on Mot. for Summ. J. Tr. at 6.)

These stipulations bind the State in this litigation. Further, because the Court has relied on them in determining which activities are still in issue and which are not, they will likely also bind the State in the future under the doctrine of judicial estoppel should the State contravene them, for example, by attempting to prosecute non-dentists who instruct a customer on teeth-whitening procedures and methods. *See DeRosa v. Nat'l Envelope Corp.*, 595 F.3d 99, 103 (2d Cir. 2010) ("Typically, judicial estoppel will apply if: 1) a party's later position is clearly inconsistent with its earlier position; 2) the party's former position has been adopted in some way by the court in the earlier proceeding; and 3) the party asserting the two positions would derive an unfair advantage against the party seeking estoppel. We further limit judicial estoppel to situations where the risk of inconsistent results with its impact on judicial integrity is certain." (internal quotation marks and citations omitted)). While the Court need not and does not decide whether judicial estoppel will apply to any future prosecution, it does rely on and adopt the

12

Attorney General's clarifications of the Declaratory Ruling and its stipulations as to the meaning of the statutes governing the practice of dentistry.

The parties agree that the Ruling permits Plaintiff to provide a chair, a LED light, and a place for the customer to sit and shine the LED light on herself during teeth whitening. The parties further agree that the Declaratory Ruling bars a non-dentist from pointing the LED light at the customer. (*See* Defs.' Opp'n to Pl.'s Mot. for Summ. J. at 1 [Dkt. # 52] ("In fact, the only activity engaged in by plaintiff which is prohibited by the Declaratory Ruling is the positioning of a LED light in front of a patient by an unlicensed individual.") (emphasis in original); Pl.'s Reply in Supp. of Mot. for Summ. J. at 1 [Dkt. # 56] ("Under this new interpretation, the only activity of Plaintiff's that is prohibited is the positioning of an LED light in front of a customer's mouth.") Thus, the only remaining issue is whether the Constitution forbids a State from prohibiting a non-dentist from pointing a LED light at a customer's mouth during teeth whitening.

## II.     DISCUSSION

### A.     Legal Standards

#### 1.     *Summary Judgment*

Summary judgment is appropriate only when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving parties bear the burden of demonstrating that no genuine issue exists as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986). "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006) (quotation marks omitted). If the moving party carries its burden, "the opposing party must come forward with specific evidence demonstrating the existence of a

13

genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011).  In this case, both parties have moved for summary judgment.

### 2. *Substantive Due Process and Equal Protection Challenges*

Because this case does not involve a "suspect" or "quasi-suspect" classification, such as discrimination on the basis of race or gender, and because the restriction at issue does not implicate fundamental rights, the analysis of the substantive due process claim tracks the analysis of the equal protection claim.  *U.S. Baseball v. City of New York*, 509 F. Supp. 2d 285, 296 (S.D.N.Y. 2007) ("The plaintiffs' arguments with respect to the federal Due Process Clause fare no better [than their equal protection arguments]. The same rational-basis standard of review described above applies to substantive due process claims where, as here, the legislative act at issue does not impinge upon a fundamental right." (citing cases)).  The Court applies to both claims the highly deferential "rational basis" standard – one the Supreme Court has called a "paradigm of judicial restraint."  *Beach Commc'ns*, 508 U.S. at 314.  A classification or restriction survives rational basis review "if there is *any reasonably conceivable state of facts that could provide a rational basis for the classification.*"  *Id.* at 313 (emphasis added).  The great judicial deference reflected in those words flows from the architecture of our constitutional design, which allocates policymaking authority in the economic and social spheres to elected officials:

> [E]qual protection is not a license for courts to judge the wisdom, fairness or logic of legislative choices.  In areas of social and economic policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification.  Where there are plausible reasons for Congress' action, our inquiry is at an end.  . . . The Constitution presumes that, absent some reason to infer antipathy, even improvident decisions will eventually be rectified by the democratic process and that judicial intervention is generally unwarranted no matter how unwisely we may think a political branch has acted.

14

*Id.* at 313-14 (internal quotation marks and citations omitted).  These principles apply equally to cases like this one that challenge applications of legislative enactments by the executive branch.  *See, e.g., Catlin v. Sobol*, 93 F.3d 1112 (2d Cir. 1996) (applying rational basis scrutiny to Education Commissioner's application of residency requirements in New York Education Law); *Manufactured Hous. Inst. v. E.P.A.*, 467 F.3d 391 (4th Cir. 2006) (rejecting rational basis challenge to Environmental Protection Agency's interpretation of Safe Drinking Water Act).[7]

Perhaps because of its constitutional pedigree, the judicial restraint underlying rational basis review has proven to be extremely indulgent of legislative restrictions, and exceedingly difficult for challengers to overcome.  The Second Circuit has explained it this way:

> [I]t is very difficult to overcome the strong presumption of rationality that attaches to a statute.  We will not strike down a law as irrational simply because it may not succeed in bringing about the result it seeks to accomplish, because the problem could have been better addressed in some other way, or because the statute's classfications lack razor-sharp precision.   Nor will a statute be overturned on the basis that no empirical evidence supports the assumptions underlying the legislative choice.   To succeed on a claim such as this, those challenging the legislative judgment must convince the court that the legislative facts on which the classification is apparently based could not reasonably be conceived to be true by the government decisionmaker.

*Beattie v. City of New York*, 123 F.3d 707, 712-13 (2d Cir. 1997) (rejecting rational basis challenge to application of city's smoke-free air ordinance to cigar smoke, where "[a]t best, plaintiff's evidence suggests a lack of direct empirical support for the assumption that cigar smoke is as harmful as cigarette smoke or his evidence might demonstrate the existence of a scientific dispute over the risks in question.").  A plaintiff challenging a statute or rule as lacking

---

[7] As long as general parameters are prescribed, legislatures are free to delegate to executive branch officials the authority to construe and apply statutes.  *United States v. Yousef*, 327 F.3d 56, 115-16 (2d Cir. 2003) ("It has long been the rule that Congress may delegate some of its legislative powers to the Executive Branch, so long as that delegation is made under the limitation of a prescribed standard.") (internal quotation marks omitted).  There has been no suggestion in this case that the Dental Practice Act fails to prescribe standards and thereby constitutes an impermissible delegation of legislative authority to the Commission.

15

a rational basis bears the burden of "discredit[ing] any conceivable basis which could be advanced to support the challenged provision, regardless of whether that basis has a foundation in the record or actually motivated the legislature." *Id.* at 713; *see also Heller v. Doe*, 509 U.S. 312, 320-21 (1993) ("[T]he burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it, whether or not the basis has a foundation in the record.") (internal quotation marks and citations omitted). It is not enough for the challenger to show that the government was actually mistaken in its factual assumptions or reasoning, that the restriction at issue was supported by "rational speculation" rather than empirical evidence, that the "rational basis" for the restriction or classification was not the rationale the legislature had in mind, or that the restriction adopted is over-inclusive or under-inclusive. A statute suffering from all of these flaws may still survive rational basis scrutiny. In short, while a few courts have stated that "rational basis review . . . is not meant to be toothless," *Windsor v. United States*, 699 F.3d 169, 180 (2d Cir. 2012) (internal quotation marks and citation omitted), the teeth are dull and the bite rare.

**B.** **Plaintiff Has Failed to Show that The Restriction on the Deploying of Lights During Teeth Whitening Lacks A Rational Basis.**

While Plaintiff has raised serious questions about the wisdom of the Commission's applying the dental practice statute to forbid non-dentists from deploying lights, including Plaintiff's LED light, during teeth whitening, this is not the rare case in which Plaintiff has borne the heavy burden of demonstrating that there is no "conceivable basis" that "could be advanced to support the challenged provision." To begin with, the parties agree that the protection of the public's health and safety with respect to the teeth and mouth – the interest advanced by the State in defense of the Declaratory Ruling – is a legitimate governmental interest. (Defs.' Mem. in Supp. of Mot. for Summ. J. at 17; Pls.' Mem. in Supp. of Mot. for Summ. J. at 22 [Dkt. # 49-1].);

*see also Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 538 (1993) (noting "[t]he legitimate governmental interest[ ] in protecting the public health"). Plaintiff nonetheless contends that barring it and other non-dentists from pointing LED lights at a customer's mouth during teeth whitening is not rationally related to the interest of protecting the public's oral health. Plaintiff makes four points in support of this contention. First, Plaintiff argues that the undisputed evidence in the record shows that the use of LED lights during teeth whitening is harmless and, more specifically, that the State has failed to submit any admissible evidence that would rebut Plaintiff's ample evidence that the practice is perfectly safe. Second, Plaintiff asserts that even if there were some health risk, there is no logical connection between the restriction and the mitigation of that risk, because "it is utterly inconceivable that the identity of the person positioning the light could make any difference to the safety of the light." (Plf.'s Opp'n to Defs.' Mot. for Summ. J. at 13.) Third, Plaintiff argues that the restriction is irrational because the costs imposed on non-dentist teeth whiteners is vastly outweighed by any conceivable health benefits that may result from the restriction. Fourth, Plaintiff argues that the financial interest of the six dentists on the Commission in squelching competition from unlicensed, competing providers of teeth-whitening services further undercuts the rationality of the restriction. As shown below, none of these arguments satisfies the heavy burden of showing that there is no conceivable basis for the challenged restriction.

> 1. *A Few Studies Showing That There Might Be Health Risks from the Use of LED Lights – Even if They Are Inadmissible and Even if There Is No Conclusive Evidence On Point – Are Enough to Supply A Rational Basis for the Restriction.*

In an attempt to shoulder its burden, Plaintiff submitted a lengthy declaration from Dr. Martin Giniger, who is a licensed dentist and purports to be "an expert in the history, practice, and safety" of peroxide-based teeth whitening. (Giniger Decl. at ¶ 2 [Dkt. # 49-7].) Dr.

17

Giniger's credentials and experience in the field of teeth whitening are extensive. He obtained a MSD in Oral Medicine and a PhD in Biomedical Science, with a concentration in Oral Biology, from the University of Connecticut. (*Id.* at ¶ 4.) He has served as an Assistant Professor, Associate Professor, and Department Head at several accredited schools of dentistry. (*Id.* at ¶ 5.) He also has consulted for several consumer oral care companies on the subject of teeth whitening. (*Id.* at ¶ 8.) Finally, Dr. Giniger served as an expert on teeth whitening for the United States Federal Trade Commission, including testifying in litigation that led to a ruling invalidating restrictions against non-dentist teeth whiteners on antitrust grounds. *See N.C. Bd. of Dental Exam'rs v. FTC*, 717 F.3d 359 (4th Cir. 2013), *cert. granted*, 2014 U.S. LEXIS 1710, 82 U.S.L.W. 3508 (U.S. Mar. 3, 2014).[8] Dr. Giniger opined on several topics in this case, including the safety of teeth whitening in general, whether dental school curriculum includes education on teeth whitening, the safety of LED lights in general, and the safety of the LED lights used by Plaintiff.

With respect to LED lights generally, Dr. Giniger opined that, when used by non-dentists "to enhance chairside teeth whitening," they "pose no threat to public safety." (Giniger Decl. at ¶ 21.) Further, he opined that "it would be scientifically and practically impossible for these lights to cause any more harm than a household flashlight (in other words, no chance)." (*Id.* at ¶ 77.) In addition to conducting his own experiments with LED lights, experiments he claims support his opinions, Dr. Giniger states that "there is no published literature showing that any person has ever been harmed as a result of being exposed to any LED bleaching lamp, nor has there ever been any literature showing harm from exposure to the type of low-powered LED bleaching lights used by non-dentists." (*Id.* at ¶ 75.)

---

[8] The parties in this case have raised no antitrust issues, and the Court's ruling expresses no opinion on such issues.

Dr. Giniger also examined the specific LED lights used by Plaintiff. (*See id.* at ¶ 87 (noting the brand, light source, power, wavelength, and infection control).) Dr. Giniger opined that the lights used by Plaintiff "are extremely safe and have no potential for human harm when used as directed" and that they "are equivalent in strength to many home LED flashlights sold in drugstores and retail chains." (*Id.* at ¶ 88.) He also states that there is no indication in the literature that the lights used by Plaintiff are unsafe. (*Id.* at ¶ 89.)

Defendants have not challenged Dr. Giniger's expertise and have not sought to rebut his opinions. Defendants did not designate an expert in this lawsuit, and did not submit any evidence that would be clearly admissible in Court – such as affidavits or deposition testimony – as they would ordinarily be required to do to resist summary judgment. *See Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) ("Where the moving party demonstrates the absence of a genuine issue of material fact, the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." (internal quotation marks and citations omitted)). Defendants did submit documents from the hearing record before the Commission, consisting largely of the "prefiled testimony" of Dr. Meier and various articles from dental journals that were referred to in or attached to his testimony, but Plaintiff contests the admissibility of these materials and the Court's ability to consider them on summary judgment. *See* Fed. R. Civ. P. 56(c)(2), (c)(4). In doing so, Plaintiff misapprehends its burden in a rational basis challenge, which is to "negative every conceivable basis which might support it, *whether or not the basis has a foundation in the record*." Heller, 509 U.S. at 320-21 (emphasis added). The absence of admissible evidence in the record to support the restriction is not enough to doom it under the highly deferential standard applicable here. Even if the statement from Dr. Meiers and related articles from dental journals that were before the Commission had not been

submitted to the Court, the Court would still have to consider them and any other "conceivable bases" for the restriction.

Dr. Meiers, a licensed dentist and a professor of dentistry at the University of Connecticut School of Dental Medicine, provided an unsworn statement to the Commission, which he adopted under oath at the hearing.  The statement generally "provide[d] information to support the contention by the Connecticut State Dental Association that prescriptive tooth whitening should only be performed in the dental office by either a dentist or under the appropriate supervision of a dentist."  (Prefile Testimony of Jonathan C. Meiers, DMD, MS of The Connecticut State Dental Association, at 2 [Dkt. # 48-4].)  With regard to the use of enhancing lights in teeth whitening, Dr. Meiers' statement noted the following:

> There is an increasing interest in the use of lights in the delivery of in office bleaching procedures.  There is a belief among practitioners that the use of a light during in office bleaching speeds up and promotes a more pronounced whitening effect by creating an increased oxidizing potential of the bleaching gel.  However, most publications which have studied the proposed benefit of light enhancement have indicated little to no difference versus non use of the light.  Optical sources that have been used in light assisted in office bleaching are light emitting diodes (LED), halogen lamps, plasma arc lamps and lasers.

(*Id.* at 6.)  Dr. Meiers did not offer any of his own opinions on the safety of using light to enhance teeth whitening, and there is no indication in his testimony or otherwise that he has expertise in this area.  But he did discuss two articles in professional dental journals that "provide information regarding some of the risks associated with various lights used for light-activated bleaching."  (*Id.*)

The first article, authored by two German dentists and published in 2007 in a dental journal, "summarize[d] and discuss[ed] the available information concerning the efficacy, effects and side effects of activitated bleaching procedures."  (*See* Wolfgang Buchalla & Thomas Attin, *External Bleaching Therapy with Activation by Heat, Light or Laser – A Systematic Review*,

20

Dental Materials 23 (2007) (attached as Ex. 7 to Meiers Test.) at 130.)  Noting that the application of heat can accelerate the teeth whitening process by increasing the temperature of a bleaching agent, such as hydrogen peroxide, applied to the tooth surface, the article states that "data on mechanisms of action and efficacy of laser, light and heat-activated dental bleaching are still limited."  (*Id.* at 131.)  The article then examines the different types of light sources used to enhance teeth whitening, including QTH lamps (i.e., quartz-tungsten-halogen lamps), Plasma arc lamps, metal halide lamps, LED lights, and various types of lasers.  With respect to QTH lamps, plasma arc lamps, and LEDs, the article concludes that "thermal damage cannot be excluded with high-power lamps or long irradiation duriation."  (*Id.* at 132.)  With respect to LED light systems in particular, the article raises the following concerns:

> Although LED systems do "not extend as far into the [infra-red] spectral range as QTH or plasma arc lamps do[,] . . . LED systems . . . are not equipped with an additional [infra-red] filter.  A remaining concern is that there is still a portion of [infra-red] emission that inevitably also comes with LED's, because the so called 'wings' of the emission spectra of the LED's used extend into the [infra-red] region.  Thermal pulp damage from LED-systems cannot be absolutely excluded and has to be taken into consideration, especially when high power LED's are used for a longer time period.

(*Id.* at 134-35.)  The article also discusses the risks associated with an increase in "pulpal temperature" that application of lights may cause, noting that "irreversible pulp damage" has been found among test animals when the pulpal temperature is increased beyond a certain threshold, and that heating of the bleaching agent leads to "a distinctly increased penetration of peroxide … into the pulp," which may lead to "oxidative stress which could negatively affect cell metabolism."  (*Id.* at 135.)  The article concludes on a note of uncertainty:

> Heat and light-activated bleaching techniques may potentially cause pulp irritation.  As yet, it is still debatable, whether the activation results in superior tooth brightening as compared to non-activated bleaching therapies.  Therefore, application of heat- and light-activated bleaching procedures should be critically weighed up, keeping in mind the physical, physiological and patho-physiological

implications mentioned above. If heat or light-activation is applied, it is strongly advised to follow manufacturers' recommendations with limited duration of heat-activation to a short period of time, in order to avoid undesired pulpal responses.

(*Id.* at 138.)

The second article referred to by Dr. Meiers – published in 2009 in a Norwegian scientific journal – also sounds notes of uncertainty and caution about the use of light to enhance teeth whitening. (*See* Ellen M. Bruzell et al., *In Vitro Efficacy and Risk for Adverse Effects of Light-Assisted Tooth Bleaching,* Photochemical & Photobiological Sciences (2009) (attached as Ex. 1 to Meiers Test.) at 12 ("Optical sources such as light emitting diodes (LED), halogen lamps, plasma arc lamps and lasers are most commonly used for tooth bleaching. However, information on adverse effects related to bleaching lamps is scarce."); at 18 ("[L]ight-assisted bleaching procedures carried out by non-health professionals for purely cosmetic reasons should be discouraged due to potential risk of exposure to optical radiation.").) While the article focuses in part on the risks associated with ultraviolet light – which is apparently not a concern with LEDs, which emit blue light (see Meiers Test. at 6) – the article nonetheless notes that "UV and blue light exposure can also give rise to phtosensitisation reactions through endogenous (e.g., porphyrins, flavins) and exogenous (e.g., drugs, dental materials, cosmetic products) molecures inside the oral cavity." (Bruzell, et al., *supra*, at 19.) The article concludes as follows: "The use of optical radiation in tooth bleaching poses a health risk to the client and violates radiation protection regulations. Therefore, we will advise against light-assisted tooth bleaching. When bleaching lamps are still used, adequate eye and skin protection should be used by client and operator." (*Id.*) Dr. Meiers also attached other articles to his prefiled testimony that provide tentative support for the notion that the use of enhancing lights in teeth whitening poses some health risk, or at least presents uncertainties. (*See, e.g.,* American Dental

22

Association, Council on Scientific Affairs, *Tooth Whitening/Bleaching: Treatment Considerations for Dentists and Their Patients* (Sept. 2009) (attached as Ex. 5 to Meiers Test.) at 116 ("Some reports suggest that pulpal temperature can increase with bleaching light use, depending on the light source and exposure time. Pulpal irritation and tooth sensitivity may be higher with use of bleaching lights or heat application, and caution has been advised with their use.") (citing Buchalla & Attin, *supra*, and JW Baik, et al., *Effect of Light-Enhanced Bleaching on In Vitro Surface and Intrapulpal Temperature Rise*, J. Esthet. Restor. Dent. (2001) at 13:370-8).); Gerard Kugel et al., *Masters of Esthetic Dentistry* (2009) (attached as Ex. 9 to Meiers Test.) at 346 (in clinical trial, subjects reported tooth sensitivity from use of light plus whitening gel).)

To be sure, these materials hardly support a definitive conclusion that the use of enhancing lights during teeth-whitening – let alone Plaintiff's LED lights – poses a danger to the public's oral health. Their tentative tone pales next to Dr. Giniger's firm views that LED lights are harmless. (*Compare* Dr. Giniger Decl. at ¶ 88 (Plaintiff's LED lights "are extremely safe and have no potential for human harm when used as directed" and "are equivalent in strength to many home LED flashlights sold in drugstores and retail chains.") *with* Buchalla & Attin, *supra*, at 135 ("[t]hermal pulp damage from LED-systems cannot be absolutely excluded and has to be taken into consideration, especially when high power LED's are used for a longer time period.").) But these infirmities are not enough to show that the Commission's restriction on the deployment of LED lights lacks a rational basis, for the same reasons that apparent weaknesses in New York City's evidence supporting its restrictions on cigar smoking were not enough to invalidate those restrictions:

> At best, plaintiff's evidence suggests a lack of direct empirical support for the assumption that cigar smoke is as harmful as cigarette smoke or his evidence might demonstrate the existence of scientific dispute over the risks in question. But no matter how plaintiff's proof is viewed it will not serve to rebut the

23

> presumption that the statute has a rational basis. In light of lawmakers' freedom
> to engage in rational speculation unsupported by evidence, it cannot be said to be
> irrational for the New York City Council to conclude that cigar smoke might be
> harmful. And that is all the Constitution demands.

*Beattie*, 123 F.3d at 713.

Especially given the frequent expressions in the medical literature of uncertainty about the risks that might be posed by the use of lights in teeth-whitening, (*see* Buchalla & Attin, *supra*, at 131 ("data on mechanisms of action and efficacy of laser, light and heat-activated dental bleaching are still limited."); Bruzell et al., *supra*, at 12 ("information on adverse effects related to bleaching lamps is scarce."); American Dental Association, Council on Scientific Affairs, *supra*, at 116 (noting that "caution has been advised" with use of lights during teeth whitening)), the Commission might rationally have concluded that restricting the use of LED lights would protect the oral health of the public. At least where neither suspect classifications nor fundamental rights are involved, the Constitution does not prevent government officials from taking prophylactic measures to protect the public in the face of uncertainty. It is thus immaterial that – as Plaintiff emphasizes – the medical literature does not cite any instances in which anyone has ever been harmed by an LED light. *Beattie*, 123 F.3d at 713 ("[D]ue process does not require a legislative body to await concrete proof of reasonable but unproven assumptions before acting to safeguard the health of its citizens."). Judge Wood reached a similar conclusion in a case challenging a ban on the live performance of professional mixed martial arts. *Jones v. Schneiderman*, 888 F. Supp. 2d 421 (S.D.N.Y. 2012). In upholding the ban against a rational basis challenge, Judge Wood noted that, although there was limited evidence that the sport posed a serious danger to participants, "[a]t the time of the law's enactment, [mixed martial arts] was in its infancy, and medical data about the sport was limited." *Id.* at 428. She nonetheless concluded that "the New York legislature had a sufficient basis to

24

**SPA-24**

speculate that professional MMA posed a substantial threat to fighters' health and safety," pointing out that a "legislature's decision . . . may be based on rational speculation unsupported by evidence or empirical data." *Id.* (citing *Heller*, 509 U.S. at 320). Here, the medical literature provides a conceivable basis to conclude that shining a LED light at the mouth of a person who seeks to whiten her teeth might pose a health risk.

       2.    *It Is Not Irrational to Limit the Deployment of LED Lights During Teeth Whitening to Licensed Dentists.*

Plaintiff also contends that, even if there are some health risks, the restriction does not rationally mitigate those risks by prohibiting only non-dentists from shining LED lights at a customer's mouth during teeth whitening. Plaintiff points out that dental schools include no required courses in teeth whitening in general or the use of enhancing lights in particular and that the State does not require dentists to show any proficiency in any aspect of teeth whitening, including the positioning of LED lights, as a condition of dental licensure. But once the State can rationally conclude that shining LED lights at a customer's mouth during teeth whitening poses some risk to oral health, it can also rationally conclude that the practice should be restricted to persons who are trained experts in oral health, even if they have no training in the practice itself. The Commission might have reasoned that if a teeth-whitening customer did experience sensitivity from application of a light – as some apparently have, Kugel, et al., *supra*, at 346 – then a dentist would be better equipped than a non-dentist to decide when and how to modify – or cease – the application of light and/or treat the sensitivity or any other health issues that might arise during teeth whitening. *See Lange-Kessler v. Dep't of Educ.*, No. 96-7632, 1997 U.S. App. LEXIS 15275, at *9 (2d Cir. 1997) (rejecting rational basis challenge to requirements that licensed mid-wives have nursing training and affiliate with a physician or hospital because of medical complications that might arise during pregnancy or childbirth: "In

25

light of these risks, the legislature could reasonably have believed that midwives who have completed a nursing program, and who are affiliated with a medical professional, are more fit than direct-entry midwives to practice midwifery.") (citation omitted).  The Commission might also have rationally concluded that in light of the health risks involved with the use of lights, each customer seeking light-enhanced teeth whitening should first undergo individualized assessment of his or her particular oral condition and medical history – the type of evaluation that even Plaintiff acknowledges is properly classified as the practice of dentistry and properly restricted to the purview of dentists.

Plaintiff also points out that the State does not prohibit customers from shining LED lights at their own mouths and argues that this undercuts the rationality of the restriction.  This argument fails for two reasons.  First, based on the statutory scheme, the Commission arguably would not have jurisdiction to regulate such activity even if it wanted to.  The Commission's purview is limited to assisting and advising the Commissioner of Public Health in regulating the practice of dentistry.  *See* Conn. Gen. Stat. § 20-103a.  Although the statutory definition of the practice of dentistry itself is not *expressly* limited to the performing of oral-related examinations and procedures on others, as opposed to one's self, see *Id.* § 20-123(a), when read in context, it is apparent that the statutory language was intended to prevent untrained, unlicensed persons from harming others, i.e., to protect the oral health of the public.  Thus, immediately following the definition, the statute lists a series of activities in which only licensed dentists may engage, and many of these involve holding oneself out to the public as a provider of services to others.  *Id.* § 20-123(b) ("No person other than a person licensed to practice dentistry under this chapter shall: (1) Describe himself or herself by the word "Dentist" or letters "D.D.S." or "D.M.D.", or in other words, letters or title in connection with his or her name which in any way represents such

26

person as engaged in the practice of dentistry; (2) Own or carry on a dental practice or business; . . . (5) Sell or distribute [certain dental materials]; (6) Advertise to the public, . . .; (7) Give estimates of the cost of dental treatment; . . .."). Case law interpreting the statute confirms that its purpose is to protect the public by preventing the untrained, the incompetent, or the unscrupulous from tinkering with the mouths of others. *See, e.g.*, *OCA v. Christie*, 415 F. Supp.2d 115, 121 (D. Conn. 2006) ("The general purpose of the statutes regulating the practice of dentistry is to protect the health, safety and welfare of Connecticut citizens and the reputations of dentists licensed within the State by ensuring that practitioners meet certain minimum standards."); *State v. Faatz*, 83 Conn. 300, 305 (1910) ("[The Dental Practice] Act is intended to protect the dental profession from ignorant and incompetent practitioners, as well as to protect the public against the same kind of ignorance and incompetence in men setting themselves up as dentists, or, in other words, 'engaging in the practice of dentistry.'"). There is no suggestion in the statutory language or the case law interpreting it that it was intended to protect persons from themselves, and there is thus no reason to believe that the Commission would have authority to regulate what an individual does to his own mouth. As Defendant highlights in his brief, shining a light at one's own mouth is no more the practice of dentistry than the suturing of a wound on one's own body is the practice of medicine. (*See* Defs.' Mem. in Opp'n to Pl.'s Mot. for Summ. J. at 21.)

Second, even if the Commission had the authority to prohibit a person from shining a light at his own mouth, the fact that it has not done so here does not undermine the rationality of the restriction. "It is no requirement of equal protection that all evils of the same genus be eradicated or none at all." *Jankowski-Burczyk v. I.N.S.*, 291 F.3d 172, 179 (2d Cir. 2002) (quoting *Ry. Express Agency, Inc. v. New York*, 336 U.S. 106, 110 (1949)). "Rather, legislatures

27

are afforded 'substantial latitude' to establish classifications that 'roughly approximate the nature of the problem perceived, that accommodate competing concerns both public and private, and that account for limitations on the practical ability of the State to remedy every ill.'" *Jones*, 888 F. Supp. 2d at 428 (quoting *Hayden v. Patterson*, 594 F.3d 150, 169 (2d Cir. 2010) (internal quotation marks and citation omitted)). Further, courts allow a legislature to "implement [its] program step by step, . . . adopting regulations that only partially ameliorate a perceived evil and deferring complete elimination of the evil to future regulations." *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 466 (1981) (internal quotation marks and citations omitted). "Thus, legislatures are deemed to have a rational basis for laws even when the legislature 'act[s] incrementally and . . . pass[es] laws that are over (and under) inclusive.'" *Jones*, 888 F. Supp. 2d at 428 (quoting *Hayden*, 594 F.3d at 171.) Here, the Commission acted rationally in limiting its ruling to the application of light to another person during teeth whitening. The fact that some harm may still result because a customer may apply the light to his own mouth does nothing to undercut the rationality of the restriction.

Further, the cases Plaintiff cites in which courts found that certain occupational licensing schemes failed the rational basis test, *Craigmiles v. Giles*, 312 F.3d 220 (6th Cir. 2002), *Clayton v. Steinagel*, 885 F. Supp. 2d 1212 (D. Utah 2012), and *Cornwell v. Hamilton*, 80 F. Supp. 2d 1101 (S.D. Cal. 1999), are distinguishable. In all three cases, the courts reasoned that even assuming that the practice at issue carried some risk to public health, the licensing statute, as applied to the plaintiffs, would do nothing to limit that risk. *See Craigmiles*, 312 F.3d at 223, 225-26 (statute prohibiting anyone but licensed funeral directors from selling caskets found to be unconstitutional as applied to the plaintiffs, independent casket store operators, because the specialized training for licensure was irrelevant to the plaintiffs who "would not handle the

bodies, much less engage in any embalming services," and, even assuming that the quality of caskets sold could potentially threaten public health, none of the requirements for licensure would address that risk); *Clayton*, 885 F. Supp. 2d at 1213, 1215-16 (statute requiring that the plaintiffs, African hair braiders, become licensed cosmetologists before they could practice their trade found to be unconstitutional as applied to the plaintiffs because, although there may be some potential health risk associated with hair braiding, the specialized training that plaintiffs would obtain through a cosmetology license was largely irrelevant to their practice and would do nothing to limit those risks); *Cornwell*, 80 F. Supp. 2d at 1101, 1109-14 (same).

By contrast, here, it was rational for the Commission to conclude that prohibiting all but dentists from shining a light at another person's mouth during teeth whitening would limit the potential for harm to the teeth or mouth. The requirements for dental licensure ensure that dentists have medical training that makes them expert in oral health. Thus, as discussed above, and as the Commission might rationally have concluded, licensed dentists will be better equipped to assess and mitigate the risks associated with light-enhanced teeth whitening, including addressing any medical complications that might arise during the application of light and performing individual assessments of a particular patient's oral condition or medical history to determine whether the use of an enhancing light is appropriate in any given circumstance.

3.   *The Benefits of the Declaratory Ruling Are Not Wholly Insubstantial In Light of the Costs to Plaintiff*

Plaintiff argues that the Declaratory Ruling is irrational because any purported health and safety benefits accruing from the ruling are wholly insubstantial in light of the costs that the ruling imposes on non-dentist teeth whiteners. Plaintiff relies on *Plyler v. Doe*, 457 U.S. 202 (1982) for the proposition that the Supreme Court has invalidated laws whose alleged benefits were "wholly insubstantial in light of the costs." *Id.* at 230. That decision, which concerned the

29

constitutionality of a Texas statute that denied to undocumented school-age children the right to a free public education that it provides to other children residing lawfully within its borders, is entirely inapposite, and the Court's passing reference to "costs" and "benefits" was not the formulation of a legal standard but a rhetorical device used to condemn Texas's policy of denying education to an entire class of children. *See id.* at 205, 227-230.

In any event, this is not a case where the benefits are "wholly insubstantial in light of the costs." Here, although the benefits of the Declaratory Ruling do not appear to be overwhelming – namely, that the restriction on the deployment of LED lights might reduce a potential (but uncertain) health risk – neither do the costs, *i.e.*, the potential harm to Plaintiff. Plaintiff can still provide teeth whitening services. As noted, the Attorney General has clarified that the Declaratory Ruling does not prevent Plaintiff from, among other things, selling teeth whitening products, providing the purchaser of a teeth whitening product with a place to use and dispose of the product, making recommendations to a customer on how to perform teeth whitening, advising a customer on the use of trays, and instructing a customer on teeth whitening procedures or methods. (*See* Defs.' Disc. Resp. Nos. 8-11, 13; Pl.'s L. Civ. R. 56(a)(1) Statement ¶ 95; Defs.' L. Civ. R. 56(a)(2) Statement ¶ 95; Hr'g on Mot. for Summ. J. Tr. at 4.) The Declaratory Ruling does not even prevent Plaintiff from serving customers who desire light-enhanced teeth whitening: as noted, the Ruling allows Plaintiff to provide a chair, a LED light, and a place for the customer to sit and shine the LED light on herself during teeth whitening. The Declaratory Ruling only prohibits Plaintiff from actually positioning the light in front of the customer's mouth. (*See* Defs.' Opp'n to Pl.'s Mot. for Summ. J. at 1; Pl.'s Reply in Supp. of Mot. for Summ. J. at 1.) This minor intrusion on Plaintiff's ability to conduct its business weighs little on

30

any cost-benefit scale (assuming any such scale is even properly part of rational basis review) and is plainly insufficient to invalidate the Declaratory Ruling.

        4.       *The Fact that the Six Dentists on the Commission Have A Financial Interest In Restricting Competition is Irrelevant*

Plaintiff argues that the fact that the dentists on the Commission have a strong financial incentive to restrict competing providers of teeth whitening services is further evidence of the irrationality of the Declaratory Ruling. Plaintiff claims that the evidence in this case indicates that licensed dentists, including the members of the Commission themselves, routinely charge more for teeth whitening services than do businesses like Plaintiff and that the overwhelming majority of complaints received by the Commission concerning non-dentist teeth whitening come from licensed dentists or the Connecticut State Dental Association, which represents the interests of licensed dentists, not consumers. Even assuming that the Commission members have a financial incentive to restrict competition, and that that incentive motivated the Declaratory Ruling, this is irrelevant to the constitutional inquiry as long as there is a rational basis to support the restriction. *See, e.g.*, *Beach Commc'ns*, 508 U.S. at 315 ("[B]ecause we never require a legislature to articulate its reasons for enacting a statute, it is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the legislature."); *R.R. Ret. Bd. v. Fritz*, 449 U.S. 166, 179 (1980) (under rational basis review it is "constitutionally irrelevant [what] reasoning in fact underlay the legislative decision.") (internal quotation marks and citation omitted); *Beattie*, 123 F.3d at 712 ("a court must look for plausible reasons for legislative action, whether or not such reasons underlay the legislature's action.") (citation omitted); *Craigmiles*, 312 F.3d at 225 ("The question before this court is whether requiring those who sell funeral merchandise to be licensed funeral directors bears a rational

31

relationship to any legitimate purpose other than protecting the economic interests of licensed funeral directors.")

Here, there is a rational basis for the restriction. As shown, the Commission might reasonably have concluded that allowing licensed dentists to position a LED light in front of a customer's mouth during teeth whitening would further the legitimate government interest in protecting the public's oral health. This fact distinguishes this case from the cases that have found evidence of a financial incentive to be "indicia of irrationality." In those cases, the courts first determined that there was no rational relationship to any legitimate governmental purpose and were left only with illegitimate purposes to justify the restriction. *See, e.g.*, *Craigmiles*, 312 F.3d at 228 ("Finding no rational relationship to any of the articulated purposes of the state, we are left with the more obvious illegitimate purpose to which [the] licensure provision is very well tailored. The licensure requirement imposes a significant barrier to competition in the casket market."); *Cornwell*, 80 F. Supp. 2d at 1117-118 (looking to "[o]ther indicia of irrationality" only after first finding that the licensing examination as structured was not rationally related to the State's professed interests).

## III. CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment [Dkt. # 48] is GRANTED, and Plaintiff's Motion for Summary Judgment [Dkt. # 49] is DENIED.


IT IS SO ORDERED.


　　　/s/
Michael P. Shea, U.S.D.J.


Dated:　　Hartford, Connecticut
　　　　　March 28, 2014

32

**SPA-32**

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

LISA MARTINEZ
SENSATIONAL SMILES, LLC

   vs.

JEWEL MULLEN, *Dr. Comm of public Health*
JEANNE P. STRATHEARN, *DDS*
LANCE E. BANWELL, *DDS*
ELLIOT S. BERMAN, *DDS*
PETER S. KATZ, *DMD*
STEVEN G. REISS, *DDS*
BARBARA B. ULRICH
MARTIN UNGAR, *DMD*

CASE NO. 3:11CV1787(MPS)

FILED
2014 MAR 31 P 2:26
US DISTRICT COURT
HARTFORD CT

## JUDGMENT

This action having come on for consideration of the defendants' Motion for Summary Judgment and the Plaintiff's Motion for Summary Judgment before the Honorable Michael P. Shea, United States District Judge, and

The Court having considered the motions and the full record of the case including applicable principles of law, and having filed its Ruling on March 28, 2014 granting the defendants' motion and denying the plaintiff's motion, further on December 13, 2012 the plaintiff Lisa Martinez was dismissed by stipulation, it is hereby

ORDERED and ADJUDGED that judgment is entered in favor of the defendants dismissing the case.

Dated at Hartford, Connecticut, this 31st day of March, 2014.

ROBIN D. TABORA, Clerk

By_____/s/_____
Devorah Johnson
Deputy Clerk

EOD___3/31/14___

SPA-33