RECORD NO.

# 14-1381

In The
# United States Court of Appeals
### For The Second Circuit

## SENSATIONAL SMILES, LLC, DBA Smile Bright,

*Plaintiff – Appellant,*

## LISA MARTINEZ,

*Plaintiff,*

v.

**JEWEL MULLEN, DR., in her official capacity as Commissioner of Public Health, JEANNE P. STRATHEARN, DDS, in her official capacity as a Member of the Connecticut Dental Commission, ELLIOT S. BERMAN, DDS, in his official capacity as a Member of the Connecticut Dental Commission, LANCE E. BANWELL, DDS, in his official capacity as a Member of the Connecticut Dental Commission, PETER S. KATZ, DMD, in his official capacity as a Member of the Connecticut Dental Commission, STEVEN G. REISS, DDS, in his official capacity as a Member of the Connecticut Dental Commission, MARTIN UNGAR, DMD, in his official capacity as a Member of the Connecticut Dental Commission, BARBARA B. ULRICH, in her official capacity as a Member of the Connecticut Dental Commission,**

*Defendants – Appellees.*

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT AT NEW HAVEN**

---

**APPENDIX
VOLUME IV OF IV
(Pages A-817 – A-871)**

---

| | |
|---|---|
| **Paul M. Sherman** | Daniel R. Shapiro |
| **Dana Berliner** | CONNECTICUT OFFICE OF |
| INSTITUTE FOR JUSTICE | THE ATTORNEY GENERAL |
| **901 North Glebe Road, Suite 900** | 55 Elm Street, Post Office Box 120 |
| **Arlington, Virginia 22203** | Hartford, Connecticut 06106 |
| **(703) 682-9320** | (860) 808- 5210 |
| *Counsel for Appellant* | *Counsel for Appellees* |

# TABLE OF CONTENTS
## VOLUME I OF IV

**Appendix Page**

**Docket Entries** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **A-1**

**Affidavit of Jeffrey Kardys,**
**With Exhibit,**
    **sworn April 8, 2013** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **A-12**

    **Exhibits:**

    **14.**    **Prefile Testimony of Jonathan C. Meiers,**
        **DMD of the Connecticut State Dental Association,**
        **With Exhibits,**
            **dated November 15, 2010** . . . . . . . . . . . . . . . . . . . . . . . . **A-17**

**Declaration of Paul Sherman in Support of**
**Plaintiff's Motion for Summary Judgment,**
**With Exhibits,**
    **sworn April 8, 2013** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **A-195**

    **Exhibits:**

    **1.**     **Dental Commission Declaratory Ruling**
            **dated June 8, 2011** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **A-197**

    **2.**     **Letter to**
        **Stephen Barraco from**
        **Kathleen W. Boulware**
        **Re: Cease-and-Desist**
            **dated July 11, 2011** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **A-204**

    **3.**     **Transcript of Deposition of the**
        **Connecticut Department of Public Health**
        **(Kathleen Boulware)**
            **taken January 4, 2013** . . . . . . . . . . . . . . . . . . . . . . . . . . **A-206**

**Declaration of Paul Sherman in Support of
Plaintiff's Motion for Summary Judgment,
With Exhibits,**
      sworn April 8, 2013, continued:

      <u>**Exhibits,**</u> **continued:**

4.    **Defendants' Response to Second Set of Discovery Requests
      dated August 19, 2012** . . . . . . . . . . . . . . . . . . . . . . . . . . . **A-257**

5.    **Defendants' Amended Response to
      Plaintiffs' Third Set of Discovery Requests
      dated March 13, 2012** . . . . . . . . . . . . . . . . . . . . . . . . . . **A-263**

6.    **Defendant Department of Public Health's Response to
      Plaintiff's Fourth Set of Discovery Requests
      dated March 13, 2013** . . . . . . . . . . . . . . . . . . . . . . . . . . **A-270**

7.    **Connecticut Department of Public Health's Website
      "Dentist Licensure Requirements"
      dated April 4, 2013** . . . . . . . . . . . . . . . . . . . . . . . . . . . **A-278**

# TABLE OF CONTENTS
## VOLUME II OF IV

**Appendix Page**

**Declaration of Paul Sherman in Support of
Plaintiff's Motion for Summary Judgment,
With Exhibits,**
     **sworn April 8, 2013, continued from Volume I:**

**Exhibits, continued from Volume I:**

8.    **National Board Dental Examination, Part I Guide**
         **dated 2013** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **A-281**

9.    **National Board Dental Examination, Part II Guide**
         **dated 2013** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **A-312**

10.  **North East Regional Board of
Dental Examiners' Candidate Manual**
         **dated 2013** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **A-345**

11.  **Southern Regional Testing Agency's Candidate Manual**
         **dated 2013** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **A-489**

# TABLE OF CONTENTS
## VOLUME III OF IV

**Appendix Page**

**Declaration of Paul Sherman in Support of
Plaintiff's Motion for Summary Judgment,
With Exhibits,**
     sworn April 8, 2013, continued from Volume II:

    **Exhibits**, continued from Volume II:

    11.    **Southern Regional Testing Agency's Candidate Manual**
           dated 2013 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **A-530**

    12.    **Central Regional Testing Service's
           Content and Scoring Guide**
           dated 2013 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **A-630**

    13.    **Western Regional Examining Board's
           Dental Exam Candidate Guide**
           dated 2013 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **A-637**

**Declaration of Dr. Martin Ginger in Support of
Plaintiff's Motion for Summary Judgment,
With Exhibits,**
     sworn April 8, 2013 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **A-762**

    **Exhibits:**

    1.    **Curriculum Vitae of Dr. Martin Ginger**
           undated . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **A-799**

    2.    **References to the Declaration of Dr. Martin Ginger**
           undated . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **A-809**

    3.    **List of Reviewed Materials**
           undated . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **A-815**

# TABLE OF CONTENTS
## VOLUME IV OF IV

**Appendix Page**

**Declaration of Stephen Barraco in Support of
Plaintiff's Motion for Summary Judgment,
With Exhibit,**
     sworn April 8, 2013 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-817

     **Exhibit:**

     1.     **Customer Information Sheet**
          undated . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-823

**Exhibit to
Defendants' Reply to Plaintiff's Response to
Defendants' Motion for Summary Judgment**
     filed June 13, 2013:

     **Exhibit:**

     **Excerpts of Transcript of Deposition of Stephen Barraco**
          taken January 3, 2013 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-825

**Declaration of Paul Sherman in Support of
Plaintiff's Reply in Support of
Plaintiff's Motion for Summary Judgment,
With Exhibit,**
     sworn June 13, 2013 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-829

     **Exhibit:**

     14.     **Transcript of Deposition of
Connecticut Department of Public Health
(Jeanne Strathearn)**
          taken January 4, 2013 . . . . . . . . . . . . . . . . . . . . . . . . . . . A-830

**Plaintiff's Notice of Appeal**
     filed April 22, 2014 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-869

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT**

SENSATIONAL SMILES LLC,
D/B/A SMILE BRIGHT,

      Plaintiff,

v.

DR. JEWEL MULLEN, ET AL.,

      Defendants.

Civil Action No.
3:11-CV-01787-MPS

**Date: April 8, 2013**

---

**DECLARATION OF STEPHEN BARRACO IN SUPPORT OF
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

---

I, Stephen Barraco, declare under penalty of perjury that the following is true:

1. I am a citizen of the United States, a resident of the State of Connecticut, and over the age of 18 years. I make this declaration in support of Plaintiff's Motion for Summary Judgment; it is based on my personal knowledge of the facts stated herein.

**Smile Bright and Its Whitening Services**

2. Sensational Smiles LLC d/b/a Smile Bright is a Connecticut limited-liability corporation that I formed in 2007 along with my partner Tasos Kariofyllis to offer peroxide-based teeth-whitening services in Connecticut.

3. My partner and I are not licensed dentists and we are not eligible to become licensed dentists. Additionally, Smile Bright is not licensed as a professional-services corporation as required under Chapter 594a of the Connecticut Statutes for corporations that offer services that constitute the practice of dentistry, and it is not eligible to become licensed.

4. We have offered teeth-whitening services at home shows, in shopping malls, and in salons. Regardless of the location, however, the whitening process was the same.

5.   A complete description of the whitening process that we previously offered is given below.  A video that accurately demonstrates the process is also available at http://www.youtube.com/watch?v=IjZ_8qbzsGI.

6.   Our services would begin with an explanation of the product we sold and the process of teeth whitening.

7.   We would ask customers to review and sign an information sheet indicating that they would follow all of the instructions supplied with the product and affirming that they didn't have any condition that would contraindicate whitening, such as difficulty breathing comfortably through their nose during the 20-minute procedure, gum disease, or a recent oral piercing or surgery.  An accurate copy of that sheet is attached to this declaration as Exhibit 1.

8.   We told customers that not all causes of tooth discoloration will respond to peroxide-based whitening and that they should only whiten their teeth if they have healthy teeth, but our employees never attempted to diagnose the underlying cause of any tooth discoloration or whether a customer's teeth were actually healthy.

9.   We did not offer teeth whitening services to minors or to women who indicated that they were nursing or pregnant. We did not have any scientific reason for thinking that teeth whitening is dangerous for these people, we just wanted to be cautious.

10. After the customer reviewed the form and consented to the whitening process, we invited them to sit in a reclining chair like those used in salons.

11. Next, an employee would measure the color of the customer's teeth using a shade guide. A shade guide is a device that holds a row of artificial teeth of varying shades, arranged from lightest to darkest.

12. To measure the shade of the customer's teeth, the employee would compare the color of the customer's teeth to the shade guide and select the shade that was closest to the customer's

2

natural shade. This comparison was purely visual and the employee made no effort to diagnose the cause of any tooth discoloration the customer might have.

13. Using a handheld mirror, the customer was also allowed to look at the shade guide, so that the customer could decide for herself whether the employee had accurately judged the shade of the customer's teeth. The purpose of using the shade guide was so that the customer could evaluate the results of the whitening process and see how much whiter their teeth had become.

14. Next, one of our employees would put on disposable gloves and hand the customer a pre-packaged "brush up," which is a disposable tooth-cleaner that fits over the index finger like the finger of a glove. The employee would instruct the customer to open the brush up, slide it over her finger, and gently rub the surface of her visible teeth to ensure that they were free of any debris before the whitening.

15. Then the employee would open a prepackaged teeth-whitening mouth tray containing a 30% carbamide-peroxide gel. These trays were one-size-fits-all, and they were always disposed of immediately after use.

16. The employee would inspect the tray to ensure that it had shipped with whitening gel in it and that the gel was evenly distributed across the tray. If the tray did not have sufficient gel, the employee would add gel to the tray from a sterile, disposable, prepackaged plastic syringe.

17. If the gel had settled unevenly during transport, the employee would use a disposable wooden stick, similar to a tongue depressor, to spread the gel evenly across the tray. The employee would then place the tray into a disposable plastic bowl and hand it to the customer.

18. After handing the tray to the customer, the employee would instruct the customer to insert the tray into her mouth and to wiggle the tray slightly to ensure that the gel was evenly distributed over the surface of her teeth. The employee would give the customer a pair of tinted glasses then activate a blue LED light and position it in front of the customer's mouth.

3

19. After 20 minutes the light would automatically shut off.  The employee would ask the customer to remove the tray and place it back into the disposable plastic bowl. The employee would then hand the customer a small cup of water so that the customer could rinse her mouth. After rinsing, the customer would spit the water into the disposable plastic bowl and hand it to the employee, who would throw out the bowl. Finally, the employee and the customer would use the shade guide to measure the change in the color of the customer's teeth.

20. After each customer, a Smile Bright employee would disinfect the glasses, chair, and light.

21. Each time an employee would leave the customer and return, or go to work with a new customer, the employee would put on new, clean gloves.

22. At no time during the whitening procedure would our employee put their hands, or anything else, into the customer's mouth. The application of the teeth-whitening product itself was performed entirely by the customer, just as they would at home.

**Effect of Declaratory Ruling on Smile Bright**

23. In 2009, Smile Bright was a thriving small business.  We had locations in two shopping malls and one salon, and we had been featured repeatedly on local television news.

24. At that time we were not only looking at renewing the leases for our two shopping mall locations, we had begun negotiations to open in a third mall.

25. Then we heard that the Dental Commission was considering issuing a declaratory ruling on teeth whitening.  We had seen the results of similar efforts in other states, where teeth-whitening entrepreneurs like us had been forced out of business, and we did not want to renew our leases or expand our business if the Dental Commission was going to make it illegal.

26. We prepared for the worst, and wound up our businesses at at the West Farms and Enfield Square shopping malls. We had to let four employees go.

4

27. Up to that point, we had served hundreds of customers at our mall locations, averaging approximately 125 to 150 customers per week. Not one of these customers was ever injured by our teeth-whitening services.

28. We kept offering teeth whitening at our salon location, because we did not have to enter into a long-term lease with them and because we hoped we might be able to keep operating there after the declaratory ruling.

29. Once the declaratory ruling came down, we knew that we could not continue to operate as we had before.  The ruling named several of the things we did as now being the practice of dentistry, including "making recommendations of how to perform teeth whitening," "utilizing instruments and apparatus such as enhancing lights," "advising individuals on the use of trays," and "instructing a customer on teeth whitening procedures or methods."

30. We knew that the penalties for the unlicensed practice of dentistry could be quite severe.  We did not want to run the risk of fines or jail time, so we stopped offering teeth-whitening services entirely.

31. Our business is currently limited to selling teeth-whitening products for home use over the Internet.  These are the same products we used to sell in our mall and salon locations.

32.  If it we were allowed to, we would immediately resume offering teeth-whitening services and begin searching out retail space in shopping malls for new locations. However, neither us have any intention of spending years of our lives and tens of thousands of dollars taking the steps necessary to become licensed dentists.

33. We think that the Dental Commission shut down non-dentist teeth whitening because they do not want the competition.  We charged between $75 and $100, depending on what specials we were offering, which is much less than what most dentists charge.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 8, 2013.

Stephen Barraco

# Declaration of Stephen Barraco in Support of Plaintiff's Motion for Summary Judgment

# EXHIBIT 1



I understand and agree to follow all instructions as supplied with the product. I also agree not to use this product under the following circumstances.

- If I cannot breath comfortably through my nose for 20 minutes.
- If I have or have a suspicion of gum disease. (inflammation, bleeding or soreness around the gums)
- If I have had or will have oral surgery/extractions within 28 days of treatment.
- If I am allergic to peroxide, glycerin or other ingredients contained in this product.
- If I have received a piercing in the oral cavity within the last 28 days.
- If I am younger than 16 years old.
- If I am pregnant or breast feeding.
- If I am in good standing with my dentist

I understand and agree that receiving this product with any type of dental Fillings, Crowns/Caps, Veneers, and bonding, etc. is at my own risk. I agree to hold Smile Bright and its affiliates harmless. The self-administered product does not affect the above items that should be in good standing order.

**Cosmetic teeth whitening post product instructions. Recommended for the first 24 hours after use to achieve maximum results:**
- Avoid the consumption of any food types that contains strong coloring such as Curry, Beetroot and Black Currants.
- The use of any tobacco products.
- Avoid consuming any drinks with dark coloring such as red wine, beer, or colored carbonated soft drinks etc.
- I will observe my normal tooth brushing regimen

Name: _____ Age: _____

Address: _____City _____ State _____ Zip code _____

E-mail (For internal use only): _____

Phone: _____

How Did You Hear About Us? : Friend____ Walk-in____ Radio_____ TV____ Internet____ Other_____

**I have read and understand all pre- product warnings, aftercare recommendations. I understand that Smile Bright is an over the counter (OTC) product and Whitening results vary depending on your teeth; results vary anywhere from 2 to 12 shades after whitening. I understand that I will be self administering that mouth tray and the Aesthetic Professional is only there as a guide**

Signature: _____ Date: _____

-------------------------------------**Shade Guide Information (For Internal Use Only)** -------------------------------------

Shade guide prior to whitening: _____     Shade guide after whitening: _____
Total number of shade improvements after process: _____

Aesthetic Professional: _____ Date: _____

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

Civil Action No. 3:11-cv-01787

_____
                          )
LISA MARTINEZ AND SENSATIONAL)
SMILES, LLC D/B/A SMILE    )
BRIGHT                     )
                          )
VS.                        )
                          )
DR. JEWEL MULLEN, ET AL.   )
_____  )

**ORIGINAL**

DEPOSITION OF:  STEPHEN BARRACO
DATE:     January 3, 2013
HELD AT: Assistant Attorney General Office
         55 Elm Street
         P.O. Box 120
         Hartford, CT 06141-0120

Reporter:  Aretha S. Martin, LSR
   BRANDON SMITH REPORTING SERVICE
         249 Pearl Street
   Hartford, Connecticut   06103
         (800) 852-4589

Martinez v. Mullen

1/3/2013                                              Barraco, Stephen

1  that we would back out, uh, because if that came down,

2  we would be locked into overhead that we obviously

3  couldn't afford, because we could not sell products.

4      Q    Okay.  And when did you became aware that there

5  was discussion -- what is your understanding of when the

6  declaratory ruling process started?

7      A    Some time within that year we were open.

8      Q    Okay.

9      A    We had gotten wind that there was being

10  discussions that cosmetic teeth whitening was going to

11  be banned in this state.

12      Q    And did you ever ask to participate in the

13  declaratory ruling process?

14      A    We did attend a few dental board meetings.

15      Q    Okay.

16      A    The two that we did attend, it was supposed to be

17  discussed, uh, and after three hours of, you know,

18  whatever they were discussing, they had kept postponing

19  that discussion.

20      Q    Okay.  And when you -- when the declaratory

21  ruling process, the formal declaratory ruling process,

22  started, did you ask to participate?

23      A    I was not made aware of when the actual ruling

24  was going down, and so I did not have the opportunity to

25  voice my opinion.

Martinez v. Mullen

1/3/2013                                                          Barraco, Stephen

1   Q    Okay.  Did you ask anyone at the Department of

2   Public Health to keep you abreast of when there would be

3   a declaratory ruling or make any written requests to the

4   department?

5   A    No.

6   Q    And you are sure that the salon in North Haven

7   you were taking appointments and selling the product at

8   the time that the declaratory ruling was issued in 2011?

9   A    When I was notified of it, I was -- I had stopped

10  operating.

11  Q    You had already stopped operating?

12  A    No, I stopped operating.

13  Q    When?

14  A    When I was notified of the ruling.

15  Q    Who notified you of the ruling?

16  A    My attorney.

17  Q    And when did you retain your attorney?

18  A    After the ruling.

19  Q    And so how did he notify you of the ruling?

20       MR. SHERMAN:  Objection to the extent that

21  this calls for attorney-client privilege.

22       MR. SHAPIRO:  I don't think it calls for

23  attorney-client privilege.  I am asking him a timeline.

24       MR. SHERMAN:  You can answer about when I

25  started to talk to you.

Martinez v. Mullen

1/3/2013                                                    Barraco, Stephen

1   Q   Okay.  And so within seven to ten days you

2   received a copy of it?

3   A   Yes.

4   Q   And during the process of the declaratory ruling,

5   which, if you will just take my word for it, was in

6   September of 2010, uh, is when dental commission

7   initiated the declaratory ruling proceeding, were you

8   aware of that?

9   A   Aware of the exact date or....

10  Q   Were you aware that the dental commission took an

11  action that started the declaratory ruling process that

12  was going to result in a decision?

13  A   I had heard that there were things going on.

14  Q   What did you hear?

15  A   That the dental board was trying to stop cosmetic

16  teeth whitening.

17  Q   Okay.  And did you hear that they were doing a

18  declaratory ruling proceeding?  That they were going to

19  conduct a proceeding?

20  A   Yes.

21  Q   And when did you hear that?

22  A   I don't remember the exact time.

23  Q   Do you remember approximately the time?

24  A   I attended dental board meetings, in some time --

25  or during '09.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

SENSATIONAL SMILES LLC,
D/B/A SMILE BRIGHT,

      Plaintiff,

v.

DR. JEWEL MULLEN, ET AL.,

      Defendants.

Civil Action No.
3:11-CV-01787-MPS

Date: June 13, 2013

---

### DECLARATION OF PAUL SHERMAN IN SUPPORT OF
### PLAINTIFF'S REPLY IN SUPPORT OF
### PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

---

I, Paul Sherman, declare under penalty of perjury that the following is true:

1.   I am a citizen of the United States, a resident of the Commonwealth of Virginia, and over the age of 18 years. I make this declaration in support of Plaintiff's Reply in Support of Plaintiff's Motion for Summary Judgment; it is based on my personal knowledge of the facts stated herein.

2.   Attached as Exhibit 14 to this declaration is a true and correct copy of the transcript of the 30(b)(6) deposition of the Connecticut Dental Commission.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 13, 2013.

_____
Paul Sherman

Declaration of Paul Sherman in Support of
Plaintiff's Reply in Support of Plaintiff's
Motion for Summary Judgment

# EXHIBIT 14

1

1  IN THE UNITED STATES DISTRICT COURT

2  FOR THE DISTRICT OF CONNECTICUT

3

4  Civil Action No.:  3:11-CV-01787-WWE

5  - - - - - - - - - - - - - - - - - - - - - - - - -

6  SENSATIONAL SMILES, LLC, d/b/a SMILE BRIGHT,

7                    Plaintiff,

8              vs.

9  DR. JEWEL MULLEN, ET AL,

10                    Defendants.

11 - - - - - - - - - - - - - - - - - - - - - - - - -

12

13           30(b)(6) DEPOSITION OF THE

14         DEPARTMENT OF PUBLIC HEALTH

15           By:  JEANNE STRATHEARN

16             January 4, 2013

17

18

19

20

21

22

23

24

25

2

1   A p p e a r a n c e s:

2        For the Plaintiff:

3             INSTITUTE FOR JUSTICE

4             901 North Glebe Road, Suite 900

5             Arlington, Virginia  22203-1854

6             (703) 682-9320

7                  By:  PAUL M. SHERMAN, ESQ.

8                       psherman@ij.org

9

10       For the Defendants and the Witness:

11            STATE OF CONNECTICUT

12            OFFICE OF THE ATTORNEY GENERAL

13            55 Elm Street

14            P.O. Box 120

15            Hartford, Connecticut  06141-0120

16            (860) 808-5210

17                 By;  DANIEL SHAPIRO, ESQ.

18                      daniel.shapiro@ct.gov

19

20

21

22

23

24

25

3

1           ...The following is the
2    30(b)(6) Deposition of the Department of
3    Public Health by:  JEANNE STRATHEARN,
4    Chairperson, Connecticut State Dental
5    Association, 835 West Queen Street,
6    Southington, Connecticut  06489, pending in
7    the United States District Court, for the
8    District of Connecticut, pursuant to Notice
9    and the Federal Rules of Civil Procedure,
10   before Jill K. Ruggieri, C.R.R., R.M.R.,
11   L.S.R. 506, a Notary Public duly commissioned
12   and qualified, at the offices of United
13   Reporters, Inc., 90 Brainard Road, Suite 103,
14   Hartford, Connecticut, on January 4, 2013, at
15   9:32 a.m., at which time counsel appeared as
16   hereinbefore set forth...
17                    STIPULATION
18           The deposition may be signed
19   before any Notary Public.
20
21
22
23
24
25

4

1  J E A N N E      S T R A T H E A R N,

2       called as a witness, being first duly

3       sworn by Jill K. Ruggieri, C.R.R.,

4       R.M.R., L.S.R. 506, a Notary Public duly

5       commissioned and qualified, was examined

6       and testified on her oath as follows:

7                DIRECT EXAMINATION

8  BY MR. SHERMAN:

9       Q.    Good morning.

10      A.    Good morning.

11      Q.    My name is Paul Sherman.  I

12  represent the Plaintiffs in this lawsuit.

13            Could you please state your name

14  and your title for the record.

15      A.    I'm Jeanne Strathearn.  I'm a

16  general dentist, and I'm the chairperson for

17  the Connecticut State Dental Commission.

18      Q.    Okay.  Have you ever had your

19  deposition taken before?

20      A.    No.

21      Q.    Okay.  Well, there's nothing to it.

22  All there is to it is, I will ask questions

23  and you have to provide truthful answers.

24  And my job is to ask clear, understandable

25  questions, so if I ask any question that you

1   don't understand or that doesn't make sense

2   to you, just let me know, and I'll try to ask

3   the question in a way that makes sense.

4         If you need a break at any time,

5   feel free to ask.  I would just ask that, if

6   there's a question pending, you answer the

7   question, and then we can take a break.  If

8   you need water or coffee or anything like

9   that, just let me know.

10         Is there any reason why you

11   wouldn't be able to testify truthfully today?

12     A.   No.

13     Q.   I didn't think so.

14         MR. SHAPIRO:  Just so the

15   record is clear, I'm Daniel Shapiro from the

16   Attorney General's Office, and I'm

17   representing the Dental Commission.

18         MR. SHERMAN:  All right.  Why

19   don't we just mark this as Exhibit 1.

20         (Plaintiff's Exhibit 1:

21   Marked for identification - described in

22   index.)

23   BY MR. SHERMAN:

24     Q.   So we've marked as Exhibit 1 the

25   notice of deposition that I sent to Attorney

6

1   Shapiro in this case.

2          Have you seen this document before?

3      A.   Yes.

4      Q.   You're aware that you've been

5   chosen by Attorney Shapiro to represent the

6   Dental Commission as a witness?

7      A.   I -- I'm speaking as a person and a

8   member of the Commission.  I can't speak for

9   the entire Commission.

10     Q.   Okay.  Well, could you do me a

11  favor?  If you look at the bottom of the

12  first page and then through to the second

13  page, you'll see that there's a list of nine

14  different subject areas.

15         Would you mind reading through

16  those just silently to yourself?

17     A.   (Witness complies.)

18     Q.   Do you have experience with the

19  matters that are set forth in those nine

20  numbered paragraphs?

21     A.   I do have experience.

22     Q.   Okay.  Do you feel qualified to

23  talk about those areas?

24     A.   About some of the areas.

25     Q.   Okay.  Are there particular areas

7

1    that you don't feel qualified to talk about?

2        A.   Yes.

3        Q.   Okay.  Could you indicate which

4    ones those are?

5        A.   (Deponent reads document.)

6             The Commission doesn't receive

7    complaints.

8        Q.   Okay.  So one of the things -- I

9    may have some personal confusion about the

10   various roles of the commission and the

11   Department of Health.  So at any point I ask

12   you a question where that's what the

13   Department of Health does, just let me know.

14       A.    Okay.  The complaints are received

15   by the Department of Public Health.

16       Q.    Okay.

17            MR. SHAPIRO:  I'm not sure

18   what you're asking the witness to do right

19   now in terms of -- do you have questions

20   about these individual areas?  I mean, is she

21   supposed to make a declaration about these

22   areas in terms of what --

23            MR. SHERMAN:  Well, I -- I

24   want to -- I mean, this is a 30(b)(6)

25   deposition.

8

```
 1                    MR. SHAPIRO:  Yes.
 2                    MR. SHERMAN:  I was required
 3    to inform you what areas I want to explore
 4    with a representative of the Dental
 5    Commission.  I want to make sure that she
 6    will be able to explore these areas.
 7         A.    The commission doesn't establish
 8    the requirements for licensure in Connecticut
 9    as a dentist or a dental hygienist.
10    BY MR. SHERMAN:
11         Q.    Okay.  All right.
12                Well, why don't we -- we'll get
13    into the questions, and if stuff comes up
14    that's not the Commission's role, it's the
15    Department of Health's role, we'll just note
16    that at each step as we go through.
17                What did you do to prepare for this
18    deposition?
19         A.    I met with Attorney Shapiro for 50
20    minutes on Wednesday, January 3rd --
21    January 2nd.
22         Q.    I think it's January 2nd.
23         A.    Today's the 4th.
24         Q.    Okay.  Did you talk with anyone
25    other than Attorney Shapiro?
```

9

```
 1        A.   No.
 2        Q.   Okay.  Did you review any documents
 3   to prepare for today's deposition?
 4        A.   I reviewed the declaratory ruling.
 5        Q.   Okay.  No other documents?
 6        A.   I read this document.
 7        Q.   Anything else?
 8        A.   No.
 9        Q.   Could you describe your educational
10   background, please?
11        A.   I went to dental hygiene school,
12   and then I went to dental school.
13        Q.   What degree in dentistry do you
14   have?
15        A.   DDS.
16        Q.   What's the difference between a DDS
17   and a DMD?
18        A.   There's no difference.  It depends
19   on the school you go to.
20        Q.   Law schools do the same thing.
21   Some have JDs and some have, I think, LLBs.
22             When did you graduate from dental
23   school?
24        A.   1986.
25        Q.   And you've been practicing as a
```

10

1  dentist since then?

2          A.    Yes.

3          Q.    Okay.  How long was your course of

4  study in dentistry?

5          A.    Four years.

6          Q.    Okay.  Is that typical?

7          A.    I believe so.

8          Q.    How long have you served on the

9  Dental Commission?

10         A.    Since the year 2000.

11         Q.    And you're currently the chair of

12 the Dental Commission?

13         A.    Yes.

14         Q.    And how long have you served as

15 chair?

16         A.    Since March of 2007.

17         Q.    How were you selected to be on the

18 commission?

19         A.    I don't know.

20         Q.    Is the commission a full-time job,

21 serving on the commission a full-time job?

22         A.    I'm not sure what you mean as --

23 when you say it's a full-time job.

24         Q.    Okay.  Are you paid for serving on

25 the commission?

11

1          A.    No.

2          Q.    Okay.  What responsibilities make

3     up your current job at the commission?

4          A.    We are entrusted with assuring

5     compliance of the statutes regarding

6     dentistry.

7          Q.    How does the commission go about

8     doing that?

9          A.    We -- two ways, by the current

10    statutes and by declaratory rulings.

11         Q.    Does the commission have employees

12    other than the commissioners themselves?

13         A.    There are no employees.

14         Q.    So is the commission just literally

15    the commissioners?

16         A.    Yes.

17         Q.    You said a moment ago that the

18    Commission assures compliance with the

19    current statutes.  How does it assure

20    compliance with the current statutes?

21         A.    On a case-by-case basis.

22         Q.    Does the Commission conduct

23    investigations as to whether people have

24    violated the statutes?

25         A.    The Commission does not conduct

1   investigations.

2       Q.    Okay.   Does the Department of

3   Health?

4       A.    Yes.

5       Q.    Does the commission assess fines or

6   penalties against violaters?

7       A.    No.

8       Q.    That's also the Department of

9   Health?

10      A.    Yes.

11      Q.    What role does the commission play

12  in assuring compliance?

13      A.    It provides advice and consent to

14  the Department of Public Health.

15      Q.    Does the commission help guide the

16  department in the interpretation of the

17  statutes?

18              MR. SHAPIRO:  Can you say the

19  question again?

20              MR. SHERMAN:   Sure.

21  BY MR. SHERMAN:

22      Q.    Does the commission help to guide

23  the Department in interpreting the statutes?

24      A.    I think the statutes speak for

25  themselves.

1      Q.    Okay.  What I'm trying to get a

2   handle on is what -- what role the commission

3   plays, what -- what does the commission do?

4      A.    The commission provides advice and

5   consent --

6      Q.    Okay.

7      A.    -- to the Department of Public

8   Health.

9      Q.    What kind of advice?

10      A.    The department may bring something

11   to the commission after an investigation with

12   an order associated with it.

13      Q.    Yes.

14      A.    The commission will provide advice

15   and consent regarding the order.

16      Q.    Okay.  Can you give me an example

17   of the time that this has happened and sort

18   of the way it plays out?  I just want to

19   understand the process.

20      A.    If a dentist has been -- if a

21   complaint has been filed to the department of

22   Public Health against a dentist for perhaps

23   prescribing narcotics in a way that shouldn't

24   have been prescribed, the department will

25   investigate and have meetings with the

1  dentist and the dentist's -- and the

2  associated structure for the investigation,

3  and the Department will propose a remedy and

4  bring that remedy to the Dental Commission.

5      Q.    Okay.

6      A.    And the Dental Commission may vote

7  in favor of it or -- or may not.

8      Q.    What happens if the Dental

9  Commission votes against the proposed remedy?

10     A.    The Department will decide how to

11 proceed.

12     Q.    Okay.  So that's the -- the

13 Department can ignore the Dental Commission's

14 vote?

15     A.    The Department can ignore the

16 Dental Commission's vote.

17     Q.    Are you aware of times when that

18 has occurred or does --

19     A.    No.

20     Q.    So the Department -- the typical

21 practice is they follow your vote?

22     A.    Yes.

23     Q.    Does the commission promulgate

24 regulations related to dentistry?

25     A.    No.

1      Q.   That's the Department?

2      A.   Yes.

3      Q.   A while back you mentioned that the

4 other way that the commission assures

5 compliance with statutes is through

6 declaratory rulings.  What is a declaratory

7 ruling?

8      A.   If you refer back -- can you

9 rephrase the beginning of your question?

10     Q.   Sure.  So earlier we were talking

11 about the roles of the commission, and you

12 said that the commission assures compliance

13 with the statutes, and you said that there

14 are two ways you do that, and I believe you

15 said you assure compliance with the current

16 statutes and you issue declaratory rulings.

17          So I'd like to talk about

18 declaratory rulings.  First off, what is a

19 declaratory ruling?

20     A.   A declaratory ruling is a -- an

21 issuance of -- of a decision based on a

22 question brought.

23     Q.   A question brought by whom?

24     A.   It could be any numbers of parties.

25     Q.   So it doesn't have to come from the

16

```
 1   Department of Public Health?  It could come
 2   from a private citizen?
 3        A.   I'm not sure I'm clear on the
 4   question.
 5        Q.   Okay.
 6             MR. SHAPIRO:  Let me just
 7   object to the question in the sense that the
 8   answer to the question is provided in the
 9   statutes, that there's no independent duty of
10   the commission to have a say in that issue,
11   meaning the answer to who can bring a
12   declaratory ruling or what a declaratory
13   ruling is in the Connecticut General Statute.
14             MR. SHERMAN:  Okay.
15   BY MR. SHERMAN:
16        Q.   Can you walk me through the
17   declaratory ruling process?
18        A.   This particular declaratory ruling
19   process?
20        Q.   First just in general?
21        A.   The Commission may decide to go
22   forward and issue a declaratory ruling, and
23   there are certain procedures which must be
24   followed.  And with the help of our attorney
25   liaison, we follow the steps by issuing
```

1  notice and asking interested parties and

2  providing notice to interested parties and

3  then asking for testimony and posting.

4           And I can't tell you all the times,

5  but there's a certain procedure that was

6  followed -- that is followed, and the

7  declaratory ruling is held properly, and then

8  there are findings of fact, and then there is

9  a issuance of the declaratory ruling.

10      Q.   Does the commission play any role

11  in determining whether someone is qualified

12  for licensure as a dentist in Connecticut?

13      A.   No.

14      Q.   Okay.

15      A.   Excuse me.  You are speaking of

16  initial licensure?

17      Q.   Correct.

18      A.   Yes.

19      Q.   Had the Dental Commission taken any

20  public stance on teeth whitening before it

21  issued it's declaratory ruling in June of

22  2011?

23           MR. SHAPIRO:  I'm going to

24  object.  It's vague in terms of what the word

25  "stance" means.

1   BY MR. SHERMAN:

2        Q.   You can answer the question if you

3   understand it.

4        A.   I don't believe so.

5        Q.   I saw a suggestion in one of the

6   documents produced by Attorney Shapiro that

7   the commission, during a meeting in June 2008

8   stated that teeth-whitening systems should

9   only be used by dentists.  Do you know if

10  that's correct?

11       A.   I don't remember.

12       Q.   Had teeth whitening by non-dentists

13  been a subject of discussion at the

14  commission meetings?

15       A.   No.

16       Q.   Okay.  It obviously became a

17  subject of discussion at some point?

18       A.   Yes.

19       Q.   Because you have the declaratory

20  ruling?

21       A.   Yes.

22       Q.   When did it first become a subject

23  of discussion?

24       A.   I don't remember.

25       Q.   Do you know approximately the year,

19

1    the month?

2         A.    I don't remember.

3         Q.    Okay.

4                   MR. SHERMAN:  I'd like to mark

5    this as Exhibit 2.

6                   (Plaintiff's Exhibit 2:

7    Marked for identification - described in

8    index.)

9    BY MR. SHERMAN:

10         Q.    Take a moment and look over this,

11    if you like.

12         A.    (Witness complies.)

13         Q.    Do you recognize this document?

14         A.    Yes, I do.

15         Q.    What is this document?

16         A.    This is the declaratory ruling.

17         Q.    Okay.  Regarding teeth whitening?

18         A.    Regarding teeth whitening.

19         Q.    If you'll turn to the first page,

20    in the first sentence, it says, "On

21    September 8, 2010, the Connecticut State

22    Dental Commission, on its own motion,

23    initiated a declaratory ruling proceeding

24    regarding whether t-e-e-t-h whitening

25    practices and/or procedures constitute the

1  practice of dentistry," et cetera.  That's a
2  correct statement?
3       A.   Yes.
4       Q.   Okay.  What prompted the commission
5  to initiate the declaratory ruling process in
6  this case?
7       A.   If I recall correctly, I believe
8  that members of the commission had heard some
9  information and stories and decided that the
10 commission should take a stand.
11      Q.   Can you be more specific about the
12 type of information and stories that they
13 heard?
14      A.   They weren't discussed.
15      Q.   I'm sorry.  Can you -- they weren't
16 discussed by the members of the commission?
17      A.   The specifics.
18      Q.   Okay.  Had you heard any
19 information and stories?
20      A.   I received two phone calls.
21      Q.   From whom?
22      A.   From -- from a dentist.
23      Q.   Okay.  Do you recall which dentist?
24      A.   I do.
25      Q.   Could you tell me who that is?

21

1        A.    Dr. Gratovich.

2        Q.    And he's a Connecticut licensed

3   dentist?

4        A.    She's a licensed dentist in

5   Connecticut.

6        Q.    Sorry.   That was sexist of me.   I

7   apologize.

8        A.    No problem.

9        Q.    But she is a Connecticut licensed

10  dentist?

11       A.    Yes.

12       Q.    Okay.   What did Dr. Gratovich

13  relate to you in those phone calls?

14       A.    Dr. Gratovich was worried about a

15  patient who was having her teeth whitened at

16  a salon and potential problems.

17       Q.    Both the phone calls were about the

18  same patient?

19       A.    One phone call was just a

20  procedural phone call.

21       Q.    Okay.   What do you mean by

22  "procedural" phone call?

23       A.    What should she do.

24       Q.    Okay.   What should Dr. Gratovich do

25  or what should the patient do?

22

1       A.    What should Dr. Gratovich do.

2       Q.    Okay.   What did you advise

3  Dr. Gratovich to do?

4       A.    To call the Department of Public

5  Health.

6       Q.    Do you know if Dr. Gratovich

7  followed your suggestion?

8       A.    I don't know that.

9       Q.    Do you know which teeth-whitening

10 business Dr. Gratovich's patient was going

11 to?

12      A.    No.

13      Q.    Did Dr. Gratovich communicate to

14 you that her patient had been harmed by teeth

15 whitening?

16      A.    She did not communicate that to me.

17      Q.    Okay.   It was just more general

18 concern?

19      A.    Yes.

20      Q.    Okay.

21            What specific concerns did

22 Dr. Gratovich communicate, if any?

23      A.    Dr. Gratovich was concerned of

24 potential harm.

25      Q.    Did Dr. Gratovich indicate what

23

1      harm she was concerned about?

2           A.    Burning tissues.

3           Q.    Any other harms?

4           A.    No.

5           Q.    Other than the communication you

6      had with Dr. Gratovich, did you receive any

7      other information or stories about people

8      concerned about teeth whitening?

9           A.    No.

10          Q.    Okay.  And you're aware other

11     members of the commission did, but they

12     didn't discuss those?

13          A.    That's correct.

14          Q.    Okay.  Did the other members of the

15     commission indicate whether the information

16     and stories they received came from dentists?

17          A.    I don't know that.

18          Q.    Did a -- strike that.

19               No consumers of -- teeth whitening

20     consumers ever contacted you with concerns

21     about non-dentist teeth whitening, did they?

22          A.    That's correct.

23          Q.    Okay.  Do you know if any consumers

24     contacted the other members of the

25     commission?

24

1      A.   I don't know that.

2      Q.   Do you know whether any of the

3 concerns that were expressed came from the

4 state dental association?

5      A.   I don't know that.

6      Q.   My understanding is that the

7 Connecticut State Dental Association is a

8 private organization and not a government

9 agency; is that correct?

10     A.   Yes.

11     Q.   Okay.

12     A.   It's a not for profit.

13     Q.   Okay.  It's a professional trade

14 group?

15     A.   It's a professional organization.

16                    (Pause.)

17     A.   It's not a trade group.

18 BY MR. SHAPIRO:

19     Q.   Okay.  Did any of the information

20 or stories that the commission received

21 indicate that any person had suffered

22 permanent harm as a result of teeth whitening

23 by a non-dentist?

24     A.   I don't know that.

25     Q.   Did any of the information or

1  stories indicate that any person had suffered

2  any harm?

3      A.   I think the testimony -- in the

4  testimony of Dr. Myers, we heard that there

5  was.

6      Q.   All right.  Do you recall the

7  nature of that harm?

8      A.   Burning tissues.

9      Q.   Can you explain what you mean by

10  "burning tissues"?

11      A.   Soft tissues harmed by the agents

12  applied without protective covering because

13  of a lack of protective covering.

14      Q.   Would you characterize that as

15  permanent harm?

16          MR. SHAPIRO:  I would object.

17  I think the question calls for speculation.

18  You can answer.

19          What -- you're asking in a

20  particular case?

21          MR. SHERMAN:  I'm asking if --

22  BY MR. SHERMAN:

23      Q.   Do you consider -- well --

24      A.   I honestly don't know the answer to

25  that question.

26

1     Q.   Okay.  You do teeth whitening as
2  part of your dental practice?
3     A.   Yes.
4    *Q.   Would you describe the procedure
5  that you use?
6              MR. SHAPIRO:  I would object.
7  It's irrelevant to the issues in the case at
8  hand.  It's not potentially leading to
9  discoverable information about what this
10 particular dentist does in her personal
11 practice.
12             She's not being sued
13 individually.  She's not being sued as an
14 individual dentist.  She's a member of a
15 Commission that decided a case.
16             MR. SHERMAN:  Well, I'm going
17 to ask you to limit speaking objections going
18 forward.
19 BY MR. SHERMAN:
20    Q.   Do you understand the question?
21    A.   Yes, but I understand the
22 objection.
23             MR. SHAPIRO:  If the question
24 asks about her personal practice, I'm going
25 to instruct her not to answer the question.

1  BY MR. SHERMAN:

2       Q.   Going back to the discussion of

3  soft tissue harm we were having a moment ago,

4  I believe you said there was concern that

5  teeth-whitening products could cause tissue

6  burning; is that correct?

7       A.   That is correct.

8       Q.   Okay.  Do you recall whether any of

9  the stories or information that you received

10  about this particular concern -- strike that.

11           Since the passage of the

12  declaratory ruling, has the commission

13  received any more information or stories

14  about teeth whitening?

15       A.   No.

16       Q.   I'd like you to turn to page 5 of

17  the declaratory ruling, if you could.

18           The final sentence on this page,

19  which carries over to the following page,

20  could you read that to yourself, please.

21       A.   (Witness complies.)

22       Q.   It begins with "Applying the light

23  source."

24       A.   (Deponent read document.)

25       Q.   What does it mean to apply a light

UNITED REPORTERS, INC.
www.unitedreporters.com
Nationwide - 866-534-3383 - Toll Free

28

1    source?

2                    MR. SHAPIRO:  I would object.

3    Dr. Strathearn has no authority to speak on

4    behalf of the commission with respect to the

5    meaning of declaratory ruling.  She's a

6    member of a multimember commission.

7    BY MR. SHERMAN:

8        Q.    Well, what's your understanding of

9    what it means?

10       A.    I think --

11                   MR. SHAPIRO:  I would object.

12   It's irrelevant.  It's irrelevant what her

13   understanding is.  Are you asking her as an

14   individual dentist, as a member of the

15   public, as a member of the commission?

16                   She can't speak for the

17   commission, and it's irrelevant what she

18   thinks it means as an individual.

19   BY MR. SHERMAN:

20       Q.    How long have you been a dentist?

21       A.    Twenty-six years.

22       Q.    So is it the commission or the

23   position -- I'm sorry.

24                   MR. SHERMAN:  Is it the

25   position of the commission that the opinion

29

1   of the chair of the commission with 26 years

2   of experience as a dentist, with regard to

3   what it might mean to apply a light, is

4   irrelevant to the outcome of this lawsuit and

5   unlikely to produce discoverable information?

6           MR. SHAPIRO:  Yes.

7   BY MR. SHERMAN:

8       Q.   Why did the commission adopt this

9   declaratory ruling?

10      A.   For protection of the public.

11      Q.   Okay.  How does this declaratory

12  ruling serve that purpose?

13      A.   I think it speaks for itself.

14          MR. SHERMAN:  Why don't we

15  take a ten-minute break.

16      A.   Okay.

17              (Whereupon, a recess was

18  taken.)

19  BY MR. SHERMAN:

20      Q.   We're almost done.

21      A.   Okay.

22      Q.   I just want to confirm a couple of

23  things before we wrap up.

24      A.   Okay.

25      Q.   So my understanding is that it is

30

1   the commission's position that you cannot

2   testify as to the meaning of the declaratory

3   ruling; is that correct?

4        A.    Can you repeat the question?

5        Q.    Sure.   Earlier I asked you some

6   questions about the meaning of the

7   declaratory ruling --

8        A.    Right.

9        Q.    -- and Attorney Shapiro objected

10  and said that you're just one member of the

11  commission.

12       A.    Right.

13       Q.    So it's my understanding that the

14  commission's position is that you cannot

15  testify about the meaning of the declaratory

16  ruling; is that correct?

17       A.    That's correct, the interpretation.

18       Q.    Okay.   And earlier we were talking

19  about concerns that people had expressed to

20  you about non-dentists doing teeth whitening,

21  and you mentioned that other members of the

22  commission had heard stories and information,

23  but you didn't know the substance of that?

24       A.    That is correct.

25       Q.    Okay.   Could you have learned the

31

1    substance of those concerns by talking with

2    other members of the commission?

3                    MR. SHAPIRO:  I would object.

4    I don't understand the question.

5                    Meaning could she have

6    investigated?  Is that what you're asking?

7                    MR. SHERMAN:  Yes.

8        A.    I suppose I could have.

9    BY MR. SHAPIRO:

10       Q.    Okay.  Do you have anything that

11   you want to add to the testimony that you've

12   given so far today?

13       A.    I believe that the declaratory

14   ruling speaks for itself, and on a

15   case-by-case basis, it will be used by the

16   Dental Commission.

17       Q.    Okay.  And is there any testimony

18   that you've given that you want to correct or

19   that you think is incorrect?

20       A.    Perhaps a couple of points may have

21   been clarified, but I don't believe I need to

22   correct anything.

23       Q.    Okay.  Is there anything that you

24   want to clarify before we conclude?

25       A.    If the Department of Public Health

32

1    presents a consent order to the Dental
2    Commission and we rejected it, the department
3    has options on where they can proceed.
4        Q.    What is a consent order?
5        A.    The consent order is the
6    preliminary decision by the parties involved
7    that needs advice and consent by the Dental
8    Commission.
9        Q.    Okay.  Is that clarification in
10   reference to your earlier statement that the
11   Department of Health could choose to ignore
12   the commission's vote on a matter?
13       A.    Yes, clarification.
14       Q.    Okay.  All right.
15            MR. SHERMAN:  Before we
16   conclude, I want it noted for the record that
17   I think the information and stories that were
18   known to other members of the Dental
19   Commission fall within the scope of
20   paragraph 3 of the 30(b)(6) deposition, and I
21   believe that the commission's position on the
22   meaning of the declaratory ruling falls
23   within the scope of paragraph 4 of the
24   30(b)(6) notice.
25            We'll conclude this

33

1   deposition, but I will reserve the right to
2   seek more time with this witness on these
3   matters.
4                   MR. SHAPIRO:   Thank you.
5                   MR. SHERMAN:   Thank you very
6   much.
7                   (Off the record discussion.)
8                   (Whereupon, the witness was
9   excused at 10:40 a.m.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

34

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

35

8

9          _____

           Jeanne Strathearn

10

11

12          Subscribed and sworn to before me

13    on this __ day of _____, 2013.

14

15

16

17          _____

18          Notary Public

19

20

21    My commission expires:

22

23

24

25

1              CERTIFICATE

2

3    STATE OF CONNECTICUT    )

4                            ) SS.

5    COUNTY OF HARTFORD       )

6         I, Jill K. Ruggieri, C.R.R., R.M.R.,

7    L.S.R. 506, a Notary Public duly commissioned

8    and qualified, do hereby certify that

9    pursuant to Notice and the Federal Rules of

10   Civil Procedure, there appeared before me on

11   January 4, 2013, at 9:32 a.m., at the Offices

12   of United Reporters, Inc., 90 Brainard Road,

13   Suite 103, Hartford, Connecticut, the

14   following-named person to wit:  JEANNE

15   STRATHEARN, who was by me first duly sworn to

16   testify to the truth and nothing but the

17   truth of her knowledge touching and

18   concerning the matters in the controversy in

19   this cause; that she was thereupon carefully

20   examined upon her oath and her testimony

21   reduced to writing under my direction by

22   computer-aided transcription; that the

23   deposition is a true record given by the

24   witness; that the deposition may be signed

25   before any Notary Public.

37

1        I further certify that I am neither

2    attorney or counsel for, nor related to or

3    employed by any of the parties to the action

4    ion which this deposition is taken, and

5    further, that I am not a relative or employee

6    of any attorney or counsel employed by the

7    parties hereto or financially interested in

8    the action.

9        In witness whereof, I have hereunto set

10   my hand this ____ day of _____,

11   2013.

12

13

14

15

16                    _____

17                    Jill K. Ruggieri, C.R.R.,

18                    R.M.R., L.S.R. 506

19                    Notary Public

20

21   My commission expires:

22   June 30, 2017

23

24

25

38

1                    I N D E X

2         DEPOSITION OF JEANNE STRATHEARN

3  EXAMINATION                 Page

4  By Mr. Sherman                4

5

6             PLAINTIFF'S EXHIBITS

7            (For identification)

8            EXHIBIT    PAGE

9               1        5

10              2

11

12       *Instructed not to answer:

13            Page   Line

14            2 6      5

15

16

17

18

19

20

21

22

23

24

25

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

SENSATIONAL SMILES LLC,
D/B/A SMILE BRIGHT,

       Plaintiff,

v.

DR. JEWEL MULLEN, ET AL.,

       Defendants.

Civil Action No.
3:11-CV-01787-MPS

**Date: April 22, 2014**

---

### PLAINTIFF'S NOTICE OF APPEAL

---

In accordance with Rule 3 of the Federal Rules of Appellate Procedure, please take notice that Plaintiff Sensational Smiles LLC, D/B/A SmileBright, appeals to the United States Court of Appeals for the Second Circuit from the judgment in this case entered on March 31, 2014, denying Plaintiff's Motion for Summary Judgment and granting Defendants' Motion for Summary Judgment.

Respectfully submitted,

**Institute for Justice**

/s/ Paul M. Sherman_____
Paul M. Sherman (DC Bar No. 978663)*
William H. Mellor (DC Bar No. 462072)*
Dana Berliner (DC Bar No. 447686)*
901 North Glebe Road, Suite 900
Arlington, VA 22203-1854
Tel: (703) 682-9320
Fax: (703) 682-9321
Email: psherman@ij.org, wmellor@ij.org,
dberliner@ij.org
*Attorneys for Plaintiff*
*\*Admitted Pro Hac Vice*

**Sawyer Law Firm, LLC**
Scott W. Sawyer (CT Bar No. CT18441)
The Jill S. Sawyer Building
251 Williams Street
New London, CT 06320
Tel: (860) 442-8131
Fax: (860) 442-4131
Email: sawyerlawyer@ct.metrocast.net
*Local Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on April 22, 2014, a true and correct copy of the foregoing

**PLAINTIFF'S NOTICE OF APPEAL** was sent via the Court's CM/ECF to the following

counsel of record:

George Jepson
Attorney General
Daniel Shapiro
Assistant Attorney General
Federal Bar No. ct20128
55 Elm Street
P.O. Box 120
Hartford, CT 06141-0120
Tel: (860) 808-5210
Fax: (860) 808-5385
Email: daniel.shapiro@ct.gov
*Attorneys for Defendants*

/s/ Paul M. Sherman
Paul M. Sherman
Attorney for Plaintiff